1. It appears plaintiffs have failed to name the appropriate governmental entity in this case. Pursuant to K.S.A. 19–105, plaintiffs cannot name Shawnee County as a defendant, but, instead, should have used the county's statutory designation of "The Board of County Commissioners of the County of Shawnee." *Barngrover v. County of Shawnee,* Case No.

---

tree" that must also be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### Conclusion

Defendant's Motion (# 24) to Suppress Evidence and Statements is GRANTED.

The ESTATE OF Scotty Ray SISK, deceased, and The Survivors of Scotty Ray Sisk, Dan and Sharon Sisk, Plaintiffs,

v.

Joel MANZANARES, Russell Green, Shawn King, Brian Cole, Mike Tolbert, Ryan Redd, and Andrew Johnson, as individuals and as officials of Shawnee County, Kansas, and the Shawnee County Department of Corrections, and The Shawnee County Department Of Corrections,[1] Defendants.

No. 00–4088–JPO.

United States District Court, D. Kansas.

Oct. 3, 2002.

---

02–4021–JAR, 2002 WL 1758914, at *1 (D.Kan. June 10, 2002). Further, the Shawnee County Department of Corrections is a subunit of the county government that lacks the capacity to be sued. *Id.* at *2. However, the parties have not raised nor briefed this issue and, therefore, the court will not resolve it at this time. Nevertheless, the court invites the parties to attempt to resolve this issue themselves. They should be prepared to discuss it at the telephone status conference on October 28, 2002.

Lee R. Barnett, Keith E. Renner, Barnett & Renner, PA, Auburn, KS, Kenneth D. Winford, Tenth Judicial District Public Defender, Olathe, KS, for Plaintiffs.

Craig C. Blumreich, William A. Larson, Gehrt & Roberts, Chartered, Timothy A. Shultz, Parker & Hay, LLP, Topeka, KS, for Defendants.

### MEMORANDUM AND ORDER

O'HARA, United States Magistrate Judge.

#### I. Introduction.

This action arises from the suicide of Scotty Ray Sisk ("Sisk") while incarcerated at the Shawnee County Department of

Corrections (the "DOC" [2]) in Topeka, Kansas. The plaintiffs, Sisk's estate and survivors, allege that defendants violated Sisk's constitutional rights by being deliberately indifferent to his medical needs. They further assert common law negligence claims.

Defendants have moved for summary judgment (**doc. 115**). The court has reviewed defendants' joint motion and supporting memorandum, plaintiffs' response (docs.122–126), and defendants' reply (doc. 132). As explained below, defendants' motion is granted in part and denied in part. Specifically, it is granted with respect to plaintiffs' constitutional claims against Cole, King, Green, and the DOC, as well as plaintiffs' negligence claims against Cole and King. However, defendants' motion is denied with respect to plaintiffs' constitutional claims against Manzanares, Redd, and Johnson, as well as plaintiffs' negligence claims against Manzanares, Redd, Johnson, Green, and the DOC.

## II.  Facts.

■  The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to plaintiffs' case. Immaterial facts and facts not properly supported by the record are omitted.[3]

### A.  Identification of Sisk as a Suicidal Inmate.

On July 2, 1999, Sisk was sentenced to one year in jail for violating a protective order and was incarcerated at the DOC. On July 6, 1999, Sisk's mother, Sharon Sisk, called defendant Joel Manzanares, a sergeant with the DOC who was the second-shift supervisor that day. She advised Manzanares that she was concerned that Sisk would hurt himself "because he had made threats to her that he would kill

---

2.  The parties have not discussed any distinction between plaintiffs' claims against the DOC and plaintiffs' claims against Shawnee County. Therefore, the court will use the term "DOC" herein to refer collectively to the DOC and Shawnee County. *See also* footnote 1, *supra.*

3.  Specifically, the court has disregarded all of plaintiffs' factual allegations which are supported by reference to the so-called Bennett Report because they do not comply with Fed. R.Civ.P. 56(e) and D. Kan. Rule 56.1. "[T]he court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e)." *Powers v. Tweco Prods., Inc.,* 206 F.Supp.2d 1097, 1103 (D.Kan.2002) (citing Fed.R.Civ.P. 56(e); D. Kan. Rule 56.1; and 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2722 (2d ed.1994)); *see, e.g., Getz v. Board of County Comm'rs,* 194 F.Supp.2d 1154, 1157 n. 1 (D.Kan.2002) (applying this rule and disregarding summary judgment exhibits that the parties failed to authenticate); *Patterson v. Dahlsten Truck Line, Inc.,* 130 F.Supp.2d

1228, 1234 (D.Kan.2000) (same). Defendants correctly point out that the parties have not stipulated to the admissibility of the Bennett Report. Further, plaintiffs have not authenticated it.

Similarly, the court also has disregarded all of plaintiffs' factual allegations which are supported by reference to a transcript of an interview with Tom Merkel. Although defendants state that one of these factual allegations is uncontroverted, defendants object to plaintiffs' reliance on this transcript in footnote three of their reply brief. A transcript of an interview is classic hearsay and, therefore, is inadmissible in ruling on a motion for summary judgment unless properly offered under one of the exceptions to the hearsay rule. *See, e.g., Bunker v. City of Olathe,* 97 F.Supp.2d 1241, 1246 n. 1 (D.Kan.2000) (considering transcripts of interviews in ruling on a motion for summary judgment only because defendants provided an affidavit authenticating the transcripts as business records). Plaintiffs have failed to provide the court with an affidavit or any other evidence that would bring this transcript within any exception to the hearsay rule.

himself and insinuated that he had already written a suicide note." Manzanares assured Ms. Sisk that the DOC had a state-of-the-art facility and nothing would happen to her son. He was aware that the third shift is the most likely time for a person to attempt to commit suicide.

Manzanares directed Karen Jennings, a corrections officer with the DOC, to look for a note in Sisk's cell. Officer Jennings found one, and Manzanares considered it to be a suicide note. Manzanares called Mary Ellen Brown, a corrections officer with the DOC, to his office and showed officer Brown the tear-stained note written by Sisk. In the note, Sisk expressed love to his parents and he had traced the outline of his hand on it. Manzanares directed officer Brown to copy the note and distribute it to the jail psychiatrist and to other supervisors and departments.

Manzanares then interviewed Sisk. At first, he found Sisk to be convincing that he would not harm himself. However, he became concerned enough to order Sisk to be moved to the medical module in order to "be on the safe side." Once Sisk was determined to be "Signal 4" (*i.e.*, suicidal), Manzanares took a number of precautions. He placed Sisk on suicide watch, ordered Sisk to be placed on a list for medical and/or psychiatric evaluation, and ordered the corrections officers to dress Sisk in paper clothing that is specially designed to tear so that it cannot be used as an aid to commit suicide.

B. *Sisk's Move to a Hard Lockdown Cell.*

In addition, Manzanares ordered the corrections officers to place Sisk in a so-called "hard lockdown" cell located in the jail's medical module. The DOC's written suicide prevention procedures call for sui-

cidal inmates to be placed in "protrusion-free" rooms. There are two types of rooms in the medical module. One type is known as a "rubber room." These rooms have walls, ceilings, and floors that have been treated with rubber coating. They do not contain any fixtures on the walls such as hooks or light switches, or any other protrusions from which an inmate could hang a blanket or a rope. The other type is called a "hard lockdown" room. It is constructed of concrete or cinder block walls with a concrete floor and a hole in the floor for inmate personal needs. The written procedures do not distinguish between rubber rooms and hard lockdown rooms.

Manzanares testified that he considers both rubber rooms and hard lockdown rooms to be protrusion-free rooms. However, other corrections officers testified that they were trained to and/or that it was the practice within the DOC to place suicidal inmates in rubber rooms and only in hard lockdown rooms if rubber rooms were unavailable. None of the rubber rooms were in use the evening of July 6, 1999. Manzanares did not attempt to determine whether a rubber room was available for Sisk.

The hard lockdown cell in which Manzanares ordered Sisk to be placed had a metal plate attached to the wall just to the left of the door. The plate was shaped like a switch-plate cover with a slit in the center. It covered the cell's thermostat. Manzanares did not consider this plate to be a protrusion. On the other hand, Lindsey Hayes, plaintiffs' expert, has opined that Sisk was not placed in a "protrusion-free" cell (as required by [DOC] policy) because he was able to "utilize a metal wall plate as an anchoring device in his suicide."[4] Dana McKnight, a corrections of-

---

**4.** If defendants had objected to plaintiffs' factual allegations which are supported by reference to the Hayes report on the basis of the inadmissibility of the Hayes report, the court would likely have sustained those objections. *See, e.g., Wayman v. Amoco Oil Co.*, 923 F.Supp. 1322, 1371 (D.Kan.1996) (disregarding an expert report in ruling on a motion for

ficer with the DOC, testified in her deposition that if Sisk had been placed in a rubber room, he would not have had anything attached to the wall of his cell that he could have used as an anchoring device to commit suicide.

### C. *The Blanket That Sisk Was Issued.*

Manzanares also ordered the corrections officers to provide Sisk with a standard-issue heavy woolen blanket and a mattress. The DOC's written procedures call for a suicidal inmate to be given, whenever possible, a blanket. Defendant Russell Green, a captain with the DOC, testified that he knew of six suicide attempts at the DOC, and none used a blanket for hanging. However, Pat Jones, a corrections officer with the DOC, testified that the DOC stopped giving suicidal inmates blankets years ago because he thought the DOC had "a few close calls. I'm not quite sure." Hayes has opined that "an inmate at high risk for suicide who has been issued a paper gown and placed in a stripped cell should not be issued a blanket that could be torn into strips."

Regardless of the written policy, however, corrections officers at the DOC such as officer Brown and Bridget McCall–Norton testified that they were trained and/or that it was the practice within the DOC to give suicidal inmates a blanket only if the blanket was a suicide preventative blanket. Suicide preventative blankets were available at the DOC prior to July 6, 1999.[5]

However, the DOC did not maintain a consistent supply of the suicide preventative blankets. At times, the DOC stocked paper shrouds for suicidal inmates to use.

Green was responsible for procuring items such as the suicide preventative blankets. He testified in his deposition that he had found no suppliers that could supply suicide preventative blankets by July of 1999. He first became aware of a "quilted" blanket that is difficult to tear that could be used for suicidal inmates in October of 1998 when he attended a seminar in Nebraska. While at this conference, Green attempted to purchase the quilted blanket from a vendor, Bob Barker, but he was told that the blanket at the seminar was merely a prototype and that the blankets would be available for sale in Barker's spring 1999 catalog. Green attempted to order the quilted blankets in the spring of 1999 and contacted the supplier, Bob Barker, by telephone a number of times to inquire about the availability of the quilted blanket. Green was advised that the quilted blankets were not available, and the supplier would not accept the DOC's order for the quilted blankets. Green was not aware of any other company other than Bob Barker that produced suicide preventative blankets before Sisk's suicide.

However, officer Brown recalled hearing Green complain, before July 6, 1999, of the cost of the suicide preventative blankets.

summary judgment, reasoning that the party "could have, and should have, set out [the expert's opinions] in an affidavit or cited to portions of [the expert's] deposition"), *aff'd*, 145 F.3d 1347 (10th Cir.1998) (unpublished table opinion); *see also, e.g., Gazaway v. Makita U.S.A., Inc.*, 11 F.Supp.2d 1281, 1287 n. 8 (D.Kan.1998) (disregarding expert reports in ruling on a motion for summary judgment because, among other reasons, they contained inadmissible hearsay and were not properly verified with a supporting affidavit), *aff'd*, 182 F.3d 931 (10th Cir.1999) (unpublished table

opinion). However, defendants have raised no such objections. In any event, the court does not find Hayes' opinions to be terribly illuminating at this procedural juncture.

**5.** The court recognizes that Green and Manzanares gave unequivocal testimony to the contrary. However, taking the evidence in the light most favorable to plaintiff, as the court must, it can reasonably be inferred that the DOC did, in fact, stock the suicide preventative blankets from time to time prior to July 6, 1999.

He allegedly stated in a joking manner that the blankets "were too expensive" to order and "just one less inmate we'd have to worry about."

By July 6, 1999, the DOC had been out of the suicide preventative blankets for quite some time. In fact, it had become an issue at the DOC. Brown testified:

> We [meaning the corrections officers] wanted clarification on the suicide procedure. We all knew that they needed to have suicide blankets, but we had been out. We had told our supervisors we needed them. And some of the supervisors would tell us just to leave them in there without a blanket if we were out of suicide blankets. Others would tell us to go ahead and let them have the wool. It really depended on which supervisor was in charge of the shift at the time.

It is undisputed that the DOC did not have any suicide preventative blankets in stock the evening of July 6, 1999, and Manzanares was aware of this fact.

On July 6, 1999, officer Brown delivered Sisk's personal belongings to the medical module. At that time, she did a quick health and well-being check on Sisk. She noticed two things: (1) Sisk was in a hard lockdown room rather than a rubber room, and (2) he had been given a woolen blanket rather than a suicide preventative blanket. She expressed her concerns to Manzanares, who responded "to just leave everything alone. He'd be all right."

D. *The Beginning of the Third Shift.*

At the end of the second shift, at approximately 10:00 p.m., Manzanares went home. At that time, defendant Shawn King, a sergeant with the DOC, came on duty as the third shift supervisor. He answered to defendant Brian Cole, a lieutenant with the DOC. Defendants Ryan Redd and Andrew Johnson came on duty as corrections officers. King and Cole were largely working "book-in" that evening.

The DOC's written procedures mandate periodic checks on suicidal inmates:

> The inmate will be checked on video monitor at least every fifteen (15) minutes. An "Inmate Health and Well Being" checklist will be initialed and signed by the shift supervisor. At least once every thirty (30) minutes a notation will be made as to what the subject is doing. This entry should be dated, timed and initialed by the reporting officer.[6]

Hayes has opined that the DOC's written procedures were

> grossly inadequate, contrary to both national jail standards and standard correctional practice, and reflected deliberate indifference. For example, the policy equated "high risk" suicidal behavior with observation at 15–minute intervals. It is common knowledge within the correctional community that because brain damage and even death from a suicide attempt by hanging can occur within four to five minutes, inmates identified as being at high risk for suicide must be observed on a continuous uninterrupted basis.

---

**6.** Plaintiffs misquoted this written procedure in their briefs. It does *not* state that the checklist "will be initialed and signed by the shift supervisor at least every thirty (30) minutes and notation will be made as to what the subject is doing." Rather, as quoted above, it actually states that the checklist "will be initialed and signed by the shift supervisor. At least once every thirty (30) minutes a notation will be made as. . . ." Thus, the written procedure does not require a supervisor to conduct thirty-minute checks. Rather, it requires someone to monitor the suicidal inmate every fifteen minutes and to make appropriate notes on the checklist every thirty minutes. The shift supervisor must simply initial and sign the checklist.

Both Redd and Johnson were advised during their briefing the evening of July 6, 1999, that Sisk was a suicidal inmate in the medical module. They both testified in their depositions that they conducted the fifteen-minute health and well being checks by visually checking Sisk approximately every fifteen minutes. Redd made all of the notations on the health and well being checklist. This log reflects that checks were conducted at 10:30 p.m., 10:45 p.m., 11:00 p.m., 11:15 p.m., and 11:30 p.m. Redd's badge number (# 932), but not Johnson's badge number (# 984), is listed next to the 10:30 p.m., 10:45 p.m., and 11:00 p.m. entries. Both badge numbers are listed next to the 11:15 p.m. and the 11:30 p.m. entries. Redd testified that it was possible that he may have made the 11:30 p.m. entry and/or corrected a mistake on the 11:15 p.m. entry approximately one hour after he made those health and well being checks.

Officer Brown testified that corrections officers occasionally missed the fifteen-minute health and well being checks of suicidal inmates. When that occurred, it was common practice to leave a blank space so the officer who missed the check could go back and write it in. Thus, the health and well being log sheets were occasionally filled in after the fact when checks had not been conducted.

King also testified that he visited the medical module and looked in on Sisk at 10:40 p.m. and again at 10:50 p.m. that evening. It is uncontroverted, however, that King did not make any marks on Sisk's health and well being checklist.

Johnson testified that, during the two months prior to July 6, 1999, when he had been working the third shift performing head counts and health and well being checks, he could not recall a supervisor ever checking on him or monitoring his work. Officer McKnight testified that the third shift was operated primarily by unsu-pervised corrections officers. Lieutenants (*e.g.*, Cole) were not seen and sergeants (*e.g.*, King) came onto the floor only when summoned. Supervisors rarely came onto the module during the third shift. Officer McCall–Norton recalls seeing Cole on the module only one time during the two years that she worked third shift. The only time officer McCall–Norton saw King on the module was when he was summoned or during a shakedown. Green was never seen on the module during the third shift, nor was he on duty that evening.

As noted above, the DOC's written procedures required suicidal inmates to be checked by video monitor. The hard lockdown cell was equipped with a video camera that transmitted a signal to a monitoring station in the medical module. However, Johnson testified that he would "visually check the person at the door every 15 minutes." He also testified that he could not see the entire cell when he visually checked at the door of the cell, whereas the video monitors could see the entire cell.

The DOC staffed the monitoring station on the first and second shifts, but not the third shift. Thus, the monitoring station was not staffed after 10:20 p.m. on July 6, 1999. Hayes has opined that

[t]here are other examples of the [DOC] policy on suicide precautions reflecting deliberate indifference, as well as lacking common sense. Although the policy required that suicidal inmates be monitored via CCTV, the practice within the [DOC] was *not* to assign sufficient staff to the third shift in order [to] monitor the CCTV equipment in the [m]edical [m]odule housing suicidal inmates.

The evening of July 6, 1999, the inmate health and well being log for Sisk was kept at the officers' work station in the medical module at the same location as the unmanned video monitors.

Catherine Smith,[7] a jail nurse at the DOC, testified that she worked until 10:00 p.m. on July 6, 1999. After her shift, she continued working in the medical module to finish up paperwork and left between 11:25 p.m. and 11:35 p.m. that evening. She did not hear the doors to the medical module open or close between the time that "Jake" (the second-shift corrections officer) left at approximately 10:10 p.m. and the time that she left at approximately 11:30 p.m. She did not witness any officers performing any health and well being checks during that time period. Further, when she looked at the log sheet laid out at the officers' work station, she observed no entries on Sisk's health and well being checklist after Jake made his last entry at 10:13 p.m. Hayes has opined that it would be unconscionable and reflect deliberate indifference if Redd and Johnson had failed to monitor Sisk at the required fifteen-minute intervals.

Smith described what she observed when she left around 11:30 p.m.:

> When I walked out ... there were two people that had just come in that I had just heard—they hadn't been there more than a minute or two—standing looking in the doorway [to Sisk's cell]. And as I walked around this corner, a third one walked up. Now, I can't remember who any of them were. They were all men and they were all big.... I remember one being white, one being black, and the other one I can't remember ... And I said, what you doing, guys? And they said, oh, nothing. And I said, well, what are you looking at? And they said, 'well we just can't see him in there.' And I said, well, why don't you open the door? ... And they said, oh, we got to wait for

the supervisor. And I said, well, I'm on the way out the door, if you need me, let me know. And I walked out. . . .

### E. Discovery of Sisk.

Redd and Johnson found Sisk hanging in his cell at approximately 11:30 p.m. Sisk was sitting to the left of the cell door with his back leaning against the wall. Redd and Johnson opened the cell door and found Sisk with a noose around his neck. Sisk had torn the blanket into strips, pried the metal plate from the wall, wrapped the blanket around the metal plate and around his neck, sat down with his back against the wall, leaned forward, and choked himself to death.

Redd immediately placed his hands under Sisk's armpits in order to relieve the pressure of the noose. Meanwhile, Johnson retrieved a noose cutter from a trauma bag and cut the noose. At 11:32 p.m., Johnson radioed Cole and advised him of the situation. Cole was in the book-in area when he received Johnson's call. He went directly to the medical module unit and radioed to the control center to request that the "911" emergency unit be called.

Cole and King arrived in the medical module unit. Redd and King conducted cardiopulmonary resuscitation ("CPR") until the emergency medical treatment ("EMT") unit arrived at 11:38 p.m., when EMT personnel continued CPR. At 11:39 p.m., the first response fire department team arrived at the scene and tried to revive Sisk. He was pronounced dead on July 7, 1999.

At some time shortly after Sisk committed suicide, officer McKnight overheard Green state that, "because one stupid

---

**7.** The court is well aware that defendants contest the veracity of Smith's testimony. However, the issues raised by defendants are credibility determinations that the court will not endeavor to resolve on a motion for summary judgment. Instead, the court must view the evidence in the light most favorable to plaintiffs, and that requires the accepting Smith's testimony as true at this particular stage of the proceedings.

mother fucker had been successful in suicide, and now he would have to spend the money to order those blankets." Nurse Smith also recalled: "I was out in front of the jail smoking, and Russ Green walked up to me and he had indicated that he had just come from the [Sisk] autopsy ... what I think he said was ... 'it's just as well the sorry son of a bitch killed himself, because if he got out of jail, he'd do it again.'"

F. *The DOC's Training Regarding Suicidal Inmates.*

The DOC provides training to new officers through a process of "shadowing," in which newly hired officers accompany experienced officers through a shift. Some time after the shadow training, every newly hired officer goes through the "jail academy." The jail academy is conducted by the DOC and consists of three weeks of eight-hour days of training. Part of the jail academy consists of training in suicide precautions and preventions, and the DOC's written procedures serve as the basis for this training. Thus, officers are familiarized with the written procedures.

When Redd was first employed with the DOC, he shadowed an experienced senior officer for approximately two weeks, then went through the academy. Johnson received approximately four weeks of shadow training with a senior officer, then went through the academy. King also went through the jail academy. Manzanares went through the jail academy and, in fact, provided suicide prevention training at the academy. Cole went through the jail academy, and has also completed supervision training, conflict resolution training, National Crime Information Center ("NCIC") training, and training regarding interview and human resource information. Green has received training and has participated in training other officers at the academy; he has attended periodic continuing education courses and seminars regarding jail standard procedures and other matters relating to the operation of the DOC.

III. Summary Judgment Standards.

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[8] The court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party.[9] A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim.[10] An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.[11]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.[12] In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but must simply point out to the court that the other party lacks evi-

---

8. Fed.R.Civ.P. 56(c).

9. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

10. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

11. *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

12. *Id.* at 670–71 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

dence on an essential element of its claim.[13] Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[14] The nonmoving party may not simply rest upon its allegations to satisfy its burden.[15] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[16] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[17]

Finally, it must be noted that summary judgment is no longer regarded as a disfavored procedural shortcut. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[18]

### IV. Analysis.

Plaintiffs assert claims against the DOC and against Manzanares, Green, King, Cole, Redd, and Johnson in their individual and official capacities with the DOC. Plaintiffs seek relief under 42 U.S.C. § 1983, alleging that defendants violated Sisk's rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the United States Constitution (as ap-

plied to the states by virtue of the Due Process Clause of the Fourteenth Amendment), by being deliberately indifferent to a substantial risk that Sisk would attempt to commit suicide. Plaintiffs also assert negligence claims under Kansas state law. Defendants seek summary judgment on all of plaintiffs' claims.

### G. *Plaintiffs' § 1983 Claims.*

#### 1. *Individual Capacity Claims Against the Individual Defendants*

The court will first examine plaintiffs' § 1983 individual capacity claims against the individual defendants, Manzanares, Green, King, Cole, Redd, and Johnson. In order to maintain these claims, plaintiffs must first offer sufficient facts to raise a genuine issue of material fact regarding whether defendants violated Sisk's constitutional rights—that is, whether defendants were deliberately indifferent to a substantial risk that Sisk would attempt to commit suicide. Second, plaintiffs must prove that defendants are not entitled to qualified immunity for their actions.[19]

As explained below, defendants' motion for summary judgment will be granted with respect to plaintiffs' § 1983 claims against Cole, King, and Green. However, plaintiffs have raised genuine issues of material fact regarding the alleged deliberate

---

13. *Id.* at 671 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548).

14. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Adler,* 144 F.3d at 671.

15. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999).

16. *Adler,* 144 F.3d at 671 (internal quotation omitted).

17. *Id.*

18. *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

19. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (stating the court must first examine whether the defendant's alleged conduct violated a constitutional right and, second, whether the right was clearly established); *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997) (stating the plaintiff must first show that the defendant's conduct violated a constitutional right and, second, that the right the defendant's conduct violated was clearly established such that a reasonable person in the defendant's position would have known the conduct violated the right).

indifference of Manzanares, Redd, and Johnson, and defendants' motion for summary judgment in favor of those defendants will be denied on that basis; further, these defendants' claims of qualified immunity are without merit.

a. *The Individual Defendants' Arguable Deliberate Indifference.*

■ Plaintiffs' claims are brought pursuant to the due process clause of the Fourteenth Amendment, but the court uses Eighth Amendment standards to evaluate those claims.[20] An inmate's Eighth Amendment rights are violated when a prison official shows deliberate indifference to the inmate's serious medical needs.[21] Claims arising from a jail suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody."[22] Under that standard, the plaintiff must prove that the defendant was deliberately indifferent to a substantial risk that the inmate might attempt to commit suicide.[23]

■ In *Farmer v. Brennan,*[24] the Supreme Court set forth the framework for evaluating constitutional claims premised upon prison officials' alleged deliberate indifference to a substantial risk of serious harm to an inmate.[25] First, a constitutional violation occurs only if the deprivation alleged is "objectively, sufficiently serious."[26] For a claim based on a failure to prevent harm, a person must show that he is being detained or incarcerated "under conditions posing a substantial risk of serious harm."[27] A substantial risk of suicide is certainly a serious harm and, therefore, satisfies the first prong of *Farmer.*

■ Second, an official must have a "sufficiently culpable state of mind."[28] The Supreme Court rejected an objective standard of liability in favor of the subjective standard of deliberate indifference: "[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[29] The deliberate indifference standard applied in Eighth Amendment cases equates with the subjective recklessness standard of criminal law.[30]

■ Finally, even if an official knows of (*i.e.,* is subjectively aware of) a substantial risk to inmate health or safety, that official may nevertheless "be found free from liability if [he] responded reasonably to the risk, even if the harm was not ultimately averted."[31] Thus, a prison official who responds reasonably to a known risk cannot be said to have "disregard[ed] an excessive risk to inmate health or safety,"[32]

**20.** *Lopez,* 172 F.3d at 759 n. 2; *Craig v. Eberly,* 164 F.3d 490, 495 (10th Cir.1998).

**21.** *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000).

**22.** *Barrie v. Grand County,* 119 F.3d 862, 866 (10th Cir.1997).

**23.** *Id.* at 869.

**24.** 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**25.** *Id.* at 828, 114 S.Ct. 1970.

**26.** *Id.* at 834, 114 S.Ct. 1970.

**27.** *Id.*

**28.** *Id.*

**29.** *Id.* at 837, 114 S.Ct. 1970.

**30.** *Id.* at 839–40, 114 S.Ct. 1970.

**31.** *Id.* at 844, 114 S.Ct. 1970 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

**32.** *Id.* at 837, 114 S.Ct. 1970.

and, therefore, has not acted with deliberate indifference.

Before the court proceeds with analyzing whether each individual defendant arguably acted with deliberate indifference, the court wishes to comment that this case is distinguishable from the overwhelming majority of § 1983 jail suicide cases. Most cases involve claims against prison officials who were not subjectively aware of a substantial risk that the inmate would attempt to commit suicide.[33] By comparison, in this case, Manzanares, Redd, and Johnson knew that Sisk was suicidal, and it could reasonably be inferred that King knew that Sisk was suicidal. Thus, the more critical inquiry with regard to these defendants is whether they "responded reasonably" to abate the known risk that Sisk would attempt to commit suicide.[34]

### i. *Defendant Manzanares*

■ Upon receiving the telephone call from Ms. Sisk, Manzanares acted promptly. He identified Sisk as a suicide risk, had him placed in a safer cell, and had him given tearable paper clothing. However, Manzanares then proceeded to order that Sisk be given a woolen blanket (rather than a paper shroud, a suicide preventative blanket, or no blanket at all), which Sisk later tore into strips and used as a noose to asphyxiate himself. He also had Sisk placed in a hard lockdown cell with a metal plate instead of one of the undeniably protrusion-free rubber rooms that were available that evening. The relevant inquiry is whether Manzanares' actions, taken as a whole, represented a reasonable response to the known risk that Sisk might attempt to take his own life.

Under different circumstances, the court believes that it would be possible to hold as a matter of law that Manzanares responded reasonably. After all, according to Green's testimony, in the six prior suicide attempts at the DOC, no inmate had ever attempted to use a blanket to hang himself. Jones' equivocal testimony that the DOC may have had "a few close calls. I'm not quite sure" is not particularly compelling in light of Green's definitive testimony in which he specifically recalled six prior suicide attempts, and the lack of the use of a blanket in any of them.

However, under the particular facts and circumstances of this case, the court believes that a genuine issue of material facts exists regarding whether a jury would regard Manzanares' actions as a reasonable response to the known risk that Sisk might attempt to take his own life. Manzanares assured Ms. Sisk that her son would be safe in the DOC's state-of-the-art facility. Then he had Sisk placed in a hard lockdown cell, which was arguably contrary to the DOC's written procedures which called for suicidal inmates to be placed in "protrusion-free" cells. Although Manzanares

---

**33.** *See generally, e.g., Hott v. Hennepin County,* 260 F.3d 901 (8th Cir.2001) (prison officials unaware that inmate was suicidal); *Boncher ex rel. Boncher v. Brown County,* 272 F.3d 484 (7th Cir.2001) (same); *Novack ex rel. Turbin v. County of Wood,* 226 F.3d 525 (7th Cir.2000) (same); *Frake v. City of Chicago,* 210 F.3d 779 (7th Cir.2000) (same; pretrial detainee); *Daniels v. Glase,* 198 F.3d 257 (10th Cir.1999) (unpublished table opinion), *text available at* Case No. 97–7115, 1999 WL 1020522, at *1–*7 (10th Cir. Nov.3, 1999) (same); *Mathis v. Fairman,* 120 F.3d 88 (7th Cir.1997) (same); *Holland v. City of Atmore,* 168 F.Supp.2d 1303 (S.D.Ala.2001) (same), *aff'd,* 37 Fed. Appx. 505 (11th Cir.2002) (unpublished table opinion); *Bowens v. City of Atmore,* 171 F.Supp.2d 1244 (S.D.Ala.) (same; inmate), *aff'd,* 275 F.3d 57 (11th Cir.2001).

**34.** *Farmer v. Brennan,* 511 U.S. at 844, 114 S.Ct. 1970; *see also Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999) (noting that prison officials are "responsible for taking reasonable measures to insure the safety of inmates" (citing *Farmer,* 511 U.S. at 832–33, 114 S.Ct. 1970)).

testified that he did not regard the metal plate as a protrusion, other testimony tends to indicate that the metal plate would be regarded as a protrusion. Most importantly, the court believes that a reasonable jury could conclude that the metal plate was, in fact, a protrusion under the common sense definition of the word "protrusion."

Further, Manzanares' decision to place Sisk in the hard lockdown cell was arguably contrary to the DOC's practice of placing suicidal inmates in rubber rooms, and in hard lockdown rooms only if the rubber rooms were unavailable. The court recognizes that this may, in fact, not be the practice within the DOC. However, testimony from corrections officers tends to indicate that this was how corrections officers were trained and that this was the practice within the DOC. Because rubber rooms were available that evening, Manzanares may have disregarded the DOC's established policies and practices by placing him in the hard lockdown unit.

In addition, Manzanares' decision to give Sisk a woolen blanket was arguably contrary to the DOC's practice of not giving regular-issue woolen blankets to suicidal inmates. Viewing the evidence in the light most favorable to plaintiffs, as the court must, Manzanares must have been aware that regular blankets posed a suicide risk. After all, the DOC had already procured alternatives to the regular woolen blankets for suicidal inmates. It had, at times, stocked the suicide preventative blankets. It had also, at times, stocked paper shrouds. Many of the corrections officers were trained to provide suicidal inmates only with paper shrouds or suicide preventative blankets. The corrections officers were in a quandary about what to do when these paper shrouds and suicide preventative blankets were unavailable, and they sought guidance from their supervisors (which guidance was inconsistent) about how to handle this issue.

Thus, Manzanares' actions were arguably contrary to the DOC's policies, procedures, and practices in handling suicidal inmates. In this respect, the court finds the Eighth Circuit's reasoning in *Gregoire v. Class*[35] to be informative. In that case, the court remarked that "we do not find it inappropriate to consider all relevant factors in judging official conduct, including other possible courses of action."[36] In this case, it may reasonably be inferred that Manzanares was aware of other possible courses of action—that is, the courses of action dictated by the DOC's policies, procedures, and practices. Yet Manzanares deliberately chose to disregard those alternative courses of action.

Perhaps the most telling bit of evidence in this regard is officer Brown's deposition testimony that she questioned Manzanares, who was her supervisor, about Sisk's placement in the hard lockdown cell and the fact that he was given a woolen blanket. She expressed her concerns to Manzanares, and he responded that she should just leave everything alone; Sisk would be all right. This is evidence about the propriety of Manzanares' actions as judged by one of his fellow prison officials at that point in time *without* having the benefit of hindsight. This colloquy is evidence of Manzanares' deliberate indifference because it evidences that Manzanares was made aware of the risk posed by the woolen blanket coupled with Sisk's placement in the hard lockdown cell, yet Manzanares knowingly discounted and disregarded that risk. Plaintiffs do not need to "show that [Manzanares] acted or failed to act believing that harm would actually befall [Sisk]; it is enough that [Manzanares]

**35.** 236 F.3d 413 (8th Cir.2000).

**36.** *Id.* at 419 n. 6.

acted or failed to act despite his knowledge of a substantial risk of serious harm." [37]

In sum, whether Manzanares' response was reasonable in light of what he actually knew regarding Sisk's suicidal tendencies is questionable. Plaintiffs have raised a genuine issue of material fact regarding whether he was deliberately indifferent to a substantial risk that Sisk would attempt to commit suicide.

### ii. *Defendants Redd and Johnson.*

Defendants Redd and Johnson were briefed the evening of July 6, 1999, regarding the fact that Sisk was suicidal. Whether they responded reasonably to that known risk is truly a question for the jury.

Admittedly, the jury could believe Redd's and Johnson's testimony that they conducted the required fifteen-minute checks on Sisk. On the other hand, the jury could believe nurse Smith's testimony that she did not hear the doors to the medical module open or close between the time the second-shift corrections officer left at approximately 10:10 p.m. (he actually logged his last check of Sisk at 10:13 p.m.) and the time nurse Smith left at approximately 11:30 p.m. Further, when she looked at the health and well being checklist laid out at the officers' work station, she observed no entries on it after the 10:13 p.m.-entry by the second-shift officer. Then, Redd entered after-the-fact entries on the log sheet. Thus, viewing the evidence in the light most favorable to the plaintiffs, as the court must, Redd and Johnson may have disregarded their obligations to conduct fifteen-minute checks

on Sisk and, instead, failed to check on him for over an hour. A reasonable jury could conclude that failure to check on a suicidal inmate for over an hour reflects deliberate indifference.[38]

In addition, Redd and Johnson admittedly violated the DOC's written procedures by failing to monitor Sisk by way of a camera, rather than by looking through the window of the cell. Looking through the window of the cell did not afford as thorough of a view of the cell. Indeed, based on Smith's explanation of the officers gazing through the window of the cell at approximately 11:30 a.m. ("well we just can't see him in there"), it appears they were unable to see the most critical portion of the cell by looking through the window. By comparison, the camera would have given them a bird's eye view of the entire cell.

In sum, whether Redd's and Johnson's responses were reasonable in light of what they actually knew regarding Sisk's suicidal tendencies is unclear. Plaintiffs have raised a genuine issue of material fact regarding whether they were deliberately indifferent to a substantial risk that Sisk would attempt to commit suicide.

### iii. *Defendant Cole.*

Because of a lack of evidence regarding Cole's personal involvement in the events leading up to Sisk's suicide, the only colorable basis for his liability arises from his status as the third-shift supervisor. "A supervisor is not liable under section 1983 unless an affirmative link exists between the constitutional deprivation

---

**37.** *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

**38.** *See, e.g., Bragado v. City of Zion,* 839 F.Supp. 551, 554 (N.D.Ill.1993) (upholding the jury's verdict where the corrections officer failed to conduct periodic inspections of a suicidal inmate as required under the jail's

policies); *cf. Sanville v. McCaughtry,* 266 F.3d 724, 738–39 (7th Cir.2001) (holding that prison guards who should have known an inmate was suicidal and yet failed to check on him for five hours did not take reasonable steps to prevent the inmate from committing suicide).

and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."[39] A supervisor must have participated in or acquiesced in the constitutional violation of the prisoner to be held liable.[40] The supervisor must have acted with deliberate indifference, rather than mere negligence.[41] In order to be guilty of deliberate indifference, the supervisor must know that he is creating a substantial risk of bodily harm.[42]

In this case, plaintiffs have failed to present any evidence from which a reasonable jury could infer that Cole was aware that any other jail personnel had created a substantial risk of bodily harm to Sisk. There is no evidence to suggest that Cole was aware that Sisk was suicidal. There is no evidence to suggest that he was aware that Manzanares had ordered Sisk to be given a regular blanket and placed in the hard lockdown cell rather than a rubber room. And there is no evidence to suggest that he was aware that Redd and Johnson were not conducting the required periodic checks.

Plaintiffs' strongest evidence against Cole is that he did not visit the modules very often. However, the mere fact that he was not integrally involved in the day-to-day activities of his subordinates does not mean that he was deliberately indifferent to the need to provide adequate medical care to suicidal inmates. There is simply no nexus between the two.

In an ideal situation, perhaps when Cole came on duty the third shift that evening he would have checked on whether the jail had any suicidal inmates and, if so, whether adequate precautionary measures had been taken with respect to those inmates. Further, he would have stopped his work every fifteen minutes to make sure that Redd and Johnson were conducting the required fifteen-minute checks. However, the relevant standard is deliberate indifference, not perfection, and there is simply no evidence in this case to suggest that Cole " 'turned a blind eye' to any particular conduct of the [other] defendants."[43]

In sum, there is no evidence that suggests Cole was deliberately indifferent, or even aware of, a substantial risk that Sisk would attempt to commit suicide. Accord-

39. *Meade v. Grubbs,* 841 F.2d 1512, 1527 (10th Cir.1988) (internal citations and quotation marks omitted).

40. *Id.* at 1528.

41. *Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir.1997).

42. *Id.*

43. *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir.2001); *see also, e.g., Westover v. Hindman,* Case No. 97–3163–GTV, 2002 WL 31028777, at *4–*6 (D.Kan. Aug.29, 2002) (granting summary judgment in favor of the director of the DOC on the plaintiff's failure to supervise claim where the plaintiff failed to present any evidence that the director personally participated in the alleged constitutional violations, knew of them, or acquiesced in them).

The Tenth Circuit's holding in *Green v. Branson,* 108 F.3d 1296 (10th Cir.1997), provides a good illustration of what is required (that is not present in this case) to maintain a § 1983 supervisory liability claim. In that case, the Tenth Circuit reversed the district court's grant of summary judgment in favor of a prison warden who allegedly took no action to obtain medical care for a prisoner after the prisoner had been beaten badly by prison guards. *Id.* at 1302–03. However, in that case, the plaintiff alleged that other prisoners had told the warden about the "ruthless and vicious assault," yet the warden did nothing. *Id.* Thus, in *Green,* the warden possessed the subjective awareness that is often the critical inquiry in determining whether a prison official acted with deliberate indifference. By comparison, in this case, there is absolutely no evidence that suggests Cole was subjectively aware or even should have been aware of any risk of harm to Sisk.

ingly, defendants' motion for summary judgment on plaintiffs' § 1983 claim against defendant Cole is granted, and that claim is dismissed.

### iv. *Defendant King.*

■ In light of the fact that King testified that he conducted checks on Sisk at 10:40 p.m. and 10:50 p.m., it can reasonably be inferred that he was aware of Sisk's suicidal state. However, beyond the fact that King was subjectively aware that Sisk was suicidal, his involvement was analogous to that of Cole because, as with Cole, there is a lack of evidence regarding King's personal involvement in the events leading up to Sisk's suicide. Therefore, the only colorable basis for his liability arises from his status as the third-shift supervisor.

As with Cole, plaintiffs have failed to present any evidence from which a reasonable jury could infer that King was aware that other jail personnel had created a substantial risk of bodily harm to Sisk. Although King may have been aware that Sisk was suicidal, there is no evidence to suggest that he was aware that Manzanares had ordered Sisk to be given a regular blanket and placed in the hard lockdown cell rather than a rubber room. Nor is there any evidence to suggest that he was aware that Redd and Johnson were not conducting the required periodic checks. Further, the mere fact that King may have visited the modules only when summoned does not mean that he was deliberately indifferent to the need to provide adequate medical care to suicidal inmates. Again, as with Cole, King could have made sure that Manzanares had ordered appropriate precautionary measures, and he could have personally made sure that Redd and Johnson conducted the required fifteen-minute checks. However, the relevant standard is deliberate indifference, not perfection, and there is simply no evidence in this case to suggest that King turned a blind eye to the conduct of Manzanares, Redd, or Johnson.

In sum, there is no evidence that suggests King was deliberately indifferent to a substantial risk of harm to Sisk. Accordingly, defendants' motion for summary judgment on plaintiffs' § 1983 claim against defendant King is granted, and that claim is dismissed.

### v. *Defendant Green*

■ Green was responsible for procuring, and yet he failed to procure, suicide preventative blankets. This fact, standing alone, is an insufficient basis for plaintiffs to maintain a § 1983 claim against Green, because there is no evidence that Green was subjectively aware of all of the other unique factors that combined to create a substantial risk that Sisk might be successful in his attempt to commit suicide.

There is no evidence to suggest that Green was aware that Sisk was suicidal. But he was certainly aware that the DOC would inevitably house suicidal inmates. He was also aware that his failure to procure suicide preventative blankets would present a less-than-ideal situation for those suicidal inmates. However, Green's own solution to this dilemma was to order the corrections officers (*e.g.*, as he did with respect to officer McCall–Norton) not to give suicidal inmates any blankets at all. While this solution might not provide for ultimate inmate comfort, it is not deliberately indifferent to inmates' suicidal tendencies. It can reasonably be inferred that Green, as a captain, expected that his subordinates (such as Manzanares) would exercise similar good judgment.

Of course, the nature of the blanket (woolen vs. suicide preventative) would not have been an issue if Sisk had lacked the means to use it. In this respect, there is no evidence that Green knew of all of the other alleged breakdowns in the DOC's

policies, procedures, and practices that were in place to protect suicidal inmates from harming themselves regardless of whether Green maintained the DOC's stock of suicide preventative blankets. For example, viewing the evidence in the light most favorable to plaintiffs, as the court must, suicidal inmates like Sisk were to be placed in rubber rooms which are truly, not just arguably, protrusion free. In addition, suicidal inmates were to be monitored at fifteen-minute intervals. If those department-mandated precautions had been carried out, the nature of Sisk's blanket would likely have been irrelevant.

Of course, the court cannot reach this conclusion without at least drawing attention to Green's cavalier attitude that the blankets "were too expensive" to order and it would be "just one less inmate we'd have to worry about," and his utterly tactless comment that "because one stupid mother fucker had been successful in suicide, and now he would have to spend the money to order those blankets." While those comments suggest that Green foresaw that his actions could ultimately result in harm to others, which would rise to the level of negligence, those comments do not change the court's conclusion that Green's actions cannot be regarded as deliberately indifferent to a substantial risk that Sisk would attempt to commit suicide.

In sum, there is no evidence that suggests Green was deliberately indifferent to a substantial risk that Sisk would attempt to commit suicide. Accordingly, defendants' motion for summary judgment on plaintiffs' § 1983 claim against defendant

Green is granted, and that claim is dismissed.

b. *The Individual Defendants' Claims of Qualified Immunity*

In light of the court's finding that plaintiffs have submitted sufficient evidence to establish the alleged constitutional violations by Manzanares, Redd, and Johnson, the court must now turn to their claims of qualified immunity. If their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known," then they are not entitled to qualified immunity.[44] The law is "clearly established," for purposes of the qualified immunity inquiry, if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts ... found the law to be as plaintiff maintains."[45] Moreover, the law must have been clearly established at the time of the alleged deprivation of the plaintiff's rights.[46] A plaintiff need not present an identical case, but, rather, "must show only that the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."[47]

In this case, defendants argue that plaintiffs must be able to direct the court's attention to an on-point case—that is, that it must be clearly established that the precautions that each individual defendant took or failed to take constitute deliberate indifference. In *Hope v. Pelzer*,[48] however, the Supreme Court explicitly rejected this argument. It is not necessary that the court find that the facts of previ-

---

**44.** *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**45.** *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992).

**46.** *Warner v. Grand County,* 57 F.3d 962, 964 (10th Cir.1995).

**47.** *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1241 (10th Cir.1999) (internal quotations omitted).

**48.** 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

ous cases are even materially similar to the facts of the instant case.[49] The court need not find a case in which "the very action in question has previously been held unlawful," but, rather, "in light of the pre-existing law the unlawfulness must be apparent."[50] In other words, the law must be such that a reasonable official would have understood that his conduct was unlawful in the situation he confronted.[51] The key to the qualified immunity inquiry is not whether a directly on-point case exists, but, rather, whether prior case law would provide prison officials with "fair warning" that their conduct was unlawful.[52]

The court has little doubt that Manzanares, Redd, and Johnson had fair warning that it would be unlawful to be deliberately indifferent to a known substantial risk that Sisk would try to commit suicide. In 1997, The Tenth Circuit recognized an inmate's (and a pretrial detainee's) established right to medical attention once the prisoner's suicidal tendencies are known.[53] Further, in 1994, the Supreme Court recognized that once prison officials know of a substantial risk of serious harm to an inmate, those prison officials can avoid liability if they "respond[ ] reasonably" to abate that risk.[54] Based on this precedent, the court concludes that on July 6, 1999, reasonable prison officials would have clearly understood that they were under an affirmative duty to take reasonable measures to abate the known risk that Sisk was suicidal.[55]

In sum, viewing the evidence in the light most favorable to the plaintiffs, the conduct of Manzanares, Redd, and Johnson violated Sisk's constitutionally protected right to medical care for his serious medical needs. Further, that constitutional right was clearly established such that a reasonable official, at the time of Sisk's suicide, would have understood that his behavior violated that right. Therefore, Manzanares, Redd, and Johnson are not entitled to qualified immunity on plaintiffs' § 1983 claims.

2. *Plaintiffs' § 1983 Claims Against the DOC and the Officers in Their Official Capacities.*

■■■■ The court will regard plaintiffs' claims against the individual defendants in their official capacities as claims against the DOC.[56] Of course, there is no vicarious

---

**49.** *Id.* at 2516. The Supreme Court's holding in *Hope* effectively overturned prior decisions such as *Sanders v. Howze*, 177 F.3d 1245 (11th Cir.1999) (jail suicide case; holding the defendants were entitled to qualified immunity because there were no precedential cases with specific facts that were materially similar to the instant case).

**50.** *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

**51.** *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**52.** *Hope*, 122 S.Ct. at 2515 (2002) (quoting *Saucier*, 533 U.S. at 206, 121 S.Ct. 2151).

**53.** *See generally Barrie v. Grand County*, 119 F.3d 862 (10th Cir.1997).

**54.** *Farmer v. Brennan*, 511 U.S. 825, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**55.** For example, in *Comstock v. McCrary*, 273 F.3d 693 (6th Cir.2001), the Sixth Circuit pointed to Supreme Court opinions as well as to precedent in the Sixth Circuit that is in all relevant respects analogous to the applicable precedent from the Tenth Circuit. The Sixth Circuit overruled the prison officials' claims of qualified immunity and concluded that based on Supreme Court and Sixth Circuit precedent, the defendant "would have clearly understood that [he] was under an affirmative duty to offer reasonable medical care to a prisoner whom he knew to be suicidal, in the circumstances confronted by [the defendant]." *Id.* at 711 (internal quotation omitted).

**56.** *Monell v. Dep't of Soc. Servcs.*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is

liability under § 1983. A county[57] may be held liable under § 1983 only for its own unconstitutional or illegal policies and not for its employees' tortious acts.[58] The county will only be liable if (1) its employee(s) committed a constitutional violation, and (2) its official policy or custom was the "moving force" behind the alleged injury alleged.[59] Thus, the plaintiff must show that the county acted with the requisite degree of culpability and that there was a direct causal link between the action and the deprivation of federal rights.[60]

In this case, plaintiffs have sufficiently alleged constitutional violations by Manzanares, Redd, and Johnson. However, plaintiffs have failed to demonstrate that the DOC's official policies were the moving force behind these alleged constitutional violations. To the contrary, the alleged constitutional violations were contrary to the DOC's policies, procedures, and practices.[61] Further, the DOC's policies, procedures, and practices can hardly be said to reflect deliberate indifference to the rights of suicidal inmates. The DOC developed very thorough written suicide prevention policies, trained its personnel to carry out those policies, constructed protrusion-free rubber rooms, and installed monitoring equipment that allows entire cells (not just portions thereof) to be viewed. The DOC's actions are a reasonable response to a known risk that the jail will inevitably house suicidal inmates.[62] Specifically, the requirement of conducting periodic checks at fifteen-minute intervals, when viewed in the context of all of the other safeguards provided by the DOC, does not reflect deliberate indifference.[63] Similarly, allowing a suicidal inmate to have a blanket, when viewed in the context

an agent. . . ."). It is unclear whether plaintiffs seek to maintain their § 1983 claims against the DOC or against Shawnee County. The distinction, however, is immaterial, because plaintiffs have failed to present sufficient evidence to maintain a § 1983 claim against either. *See also* footnotes 1 & 2, *supra.*

**57.** Municipalities and other local government entities such as counties can be sued under § 1983 for their constitutional torts. *Sauers v. Salt Lake County,* 1 F.3d 1122, 1129 (10th Cir.1993) (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 120–21, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1066) (1992); and *Monell,* 436 U.S. at 690, 98 S.Ct. 2018); *see also Board of County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[M]unicipalities and other local governmental bodies are 'persons' within the meaning of § 1983."; ruling on a § 1983 claim against a county); *Henderson v. Montgomery County,* 213 F.Supp.2d 1262, 1275 (D.Kan.2002) ("Municipalities, such as the County, are considered 'persons' to whom section 1983 liability applies.").

**58.** *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1998) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018).

**59.** *Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1316 (10th Cir. 1998) (setting forth this two-part inquiry).

**60.** *Barney,* 143 F.3d at 1307 (internal quotations omitted) (quoting *Brown,* 520 U.S. at 404, 117 S.Ct. 1382).

**61.** *See, e.g., Harris v. Robinson,* 273 F.3d 927, 932 (10th Cir.2001) (holding that summary judgment was warranted where there was no evidence that the employee's actions were consistent with an official policy or custom of the municipal employer).

**62.** *See, e.g., Rapier v. Kankakee County,* 203 F.Supp.2d 978, 984 (C.D.Ill.2002) (holding as a matter of law that a policy requiring suicidal inmates to be placed in special needs cells and be monitored with periodic checks every fifteen minutes did not amount to deliberate indifference).

**63.** *See, e.g., Clark v. McMillin,* 932 F.Supp. 789, 793 (S.D.Miss.1996) (holding as a matter of law that a fifteen-minute monitoring policy did not amount to deliberate indifference); *cf. Rhyne v. Henderson County,* 973 F.2d 386, 393 (5th Cir.1992) (rejecting the argument that prison officials were required to continuously monitor suicidal inmates).

of all of the other safeguards mandated by the DOC (such as the protrusion-free rubber rooms), does not reflect deliberate indifference.[64] Indeed, if all of these policies had been followed in this case, Sisk presumably would have been unable to take his own life. The court also fails to see how it is particularly significant that the DOC did not employ adequate personnel to staff the monitoring station during the third shift; Redd and Johnson presumably could have simply turned on the monitors and performed their monitoring duties by periodically checking the monitors rather than peering through the window of Sisk's cell.

To the extent that plaintiffs argue the DOC failed to adequately train its personnel, plaintiffs must "identify a specific deficiency in [its] training program closely related to [Sisk's] ultimate injury, and must prove that the deficiency in training actually caused [jail personnel] to act with deliberate indifference to [Sisk's] safety." [65] In this case, the evidence indicates that all of the defendants went through the DOC's jail academy, which included a suicide prevention component that was based on the DOC's written procedures. The evidence suggests that DOC personnel were trained that suicidal inmates were to be placed in rubber rooms and only in hard lockdown rooms if all of the rubber rooms were unavailable. The evidence

further suggests that DOC personnel were trained that suicidal inmates were to be given paper shrouds or suicide preventative blankets. In fact, this practice was so ingrained that the corrections officers were in a quandary about what to do when suicide preventative blankets were not in stock. It is uncontroverted that DOC personnel were also trained to place suicidal inmates in tearable paper clothing and monitor them every fifteen minutes. In sum, the plaintiffs' claim of inadequate training is without merit.[66]

Accordingly, defendants' motion for summary judgment is granted with respect to plaintiffs' § 1983 claims against the DOC, and those claims are hereby dismissed.

## H. *Plaintiffs' State Law Claims.*

■ Thus, the court will now examine the defendants' arguments that they are immune from liability on plaintiffs' state law claims. At common law, a state as the sovereign is immune from suit unless it consents.[67] The Kansas Tort Claims Act ("KTCA") provides this consent. It makes governmental entities in Kansas liable for the "negligent or wrongful act[s] or omission[s]" of their employees acting within the scope of their employment.[68] It makes liability the rule and immunity the exception, and the burden is on the governmen-

---

**64.** *Cf. Jacobs v. West Feliciana Sheriff's Dep't,* 228 F.3d 388 (5th Cir.2000) (holding the plaintiff presented sufficient evidence of deliberate indifference where the prisoner was given a blanket *and* housed in a cell with tie-off points).

**65.** *Lopez v. LeMaster,* 172 F.3d 756, 760 (10th Cir.1999) (citing *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Barney,* 143 F.3d at 1307 ("[M]unicipal liability based on a policy of inadequate training requires proof of the municipality's 'deliberate indifference' to its inhabitants—i.e., the failure to train must re-

flect a deliberate or conscious choice by a municipality.").

**66.** *See, e.g., Olivas ex rel. Miranda v. City and County of Denver,* 929 F.Supp. 1329, 1337–38 (D.Colo.1996) (rejecting the plaintiff's claim that a municipality had failed to adequately train its personnel to prevent a pretrial detainee's suicide).

**67.** *Woodruff v. City of Ottawa,* 263 Kan. 557, 561, 951 P.2d 953, 957 (1997).

**68.** K.S.A. 75–6103(a).

tal entity to establish that it is entitled to one of the exceptions.[69]

In this case, defendants claim that the following two exceptions apply to plaintiffs' negligence claims against them:

A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

(d) adoption or enforcement of, or failure to adopt·or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence;

(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved[.][70]

Thus, the court will examine whether either of these exceptions bars plaintiffs' negligence claims against the various defendants.

1. *Defendants Manzanares, Johnson, and Redd.*

As discussed above, the DOC's written procedures governed the actions of defendants Manzanares, Johnson, and Redd. Thus, their actions can by no means be regarded as discretionary under subsection (e).[71] When such mandatory guidelines exist, subsection (d) provides the immunity, if any, from liability. Under subsection (d), when mandatory guidelines exist, the government actor is immune from liability regardless of whether he or she followed those written guidelines unless an independent legal duty of care is owed to the injured party.[72]

■ In this case, all of the defendants owed an independent legal duty to Sisk. The applicable Restatement provides that

one who is required by law to take ... custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a ... duty [to protect the individual in custody against unreasonable risk of physical harm and to give the individual

---

**69.** *Kansas State Bank v. Specialized Transp. Servcs., Inc.,* 249 Kan. 348, 364, 819 P.2d 587, 599 (1991); *Hopkins v. State,* 237 Kan. 601, 609, 702 P.2d 311, 317–18 (1985).

**70.** K.S.A. 75–6104.

**71.** *Nero v. Kansas State Univ.,* 253 Kan. 567, 585, 861 P.2d 768, 781 (1993) ("If there is a clearly defined mandatory duty or guideline, the discretionary function exception is not applicable."); *see, e.g., Fudge v. City of Kan. City,* 239 Kan. 369, 375, 720 P.2d 1093, 1100 (1986) (holding the existence of mandatory department guidelines governing the conduct at issue renders the discretionary function exception inapplicable), *legislatively overruled in part on other grounds as discussed in Jarboe v. Sedgwick County Comm'rs,* 262 Kan. 615, 628–29, 938 P.2d 1293, 1303–04 (1997) (not-

ing the Kansas legislature partially overruled *Fudge* when it enacted K.S.A. 75–6104(d) insofar as *Fudge* held that liability can be based on a public employee's failure to follow written personnel policies).

**72.** *Woodruff,* 263 Kan. at 566, 951 P.2d at 959 (" '*Fudge* can no longer be relied upon as valid precedent to establish liability as a result of a public employee's failure to follow written personnel policies, **unless an independent duty of care is owed to the injured party.**' " (emphasis added) (quoting *Jarboe* )); *see, e.g., Fettke v. City of Wichita,* 264 Kan. 629, 636, 957 P.2d 409, 414 (1998) (concluding the governmental entity was immune from liability under subsection (d) because of the lack of an independent legal duty); *Schmidt v. HTG, Inc.,* 265 Kan. 372, 391–92, 961 P.2d 677, 689–90 (1998) (same).

first aid after it knows or has reason to know that the individual is ill or injured].[73]

The comments to the Restatement specifically explain that, "[t]he duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct."[74] Precedent in this jurisdiction holds that Kansas courts would adopt this rule of law and impose a legal duty on a custodian to take reasonable steps to prevent the individual from injuring himself.[75] Thus, in this case, Manzanares, Redd, and Johnson had an independent legal duty to prevent Sisk from injuring himself. Further, as discussed above, plaintiffs' have raised a genuine issue of material fact regarding whether they breached that duty of care.

In sum, defendants Manzanares, Redd, and Johnson are not entitled to immunity from liability under the KTCA. Accordingly, defendants' motion for summary judgment on plaintiffs' negligence claims against Manzanares, Redd, and Johnson is denied.

### 2. *Defendant Green.*

██ Next, the court will turn to the actions of defendant Green. Green, as with defendants Manzanares, Johnson, and Redd, had an independent legal duty to prevent Sisk from injuring himself. Therefore, as discussed above, subsection (d) of the KTCA does not grant him immunity for his actions.

Thus, the court will consider whether the discretionary function exception (subsection (e)) entitles Green to immunity under the KTCA. Arguably, Green's conduct falls within this exception because his action—*i.e.,* his failure to procure suicide preventative blankets—was not governed by any mandatory written policy; thus, he theoretically had discretion regarding how to carry out his procurement duties.

However, as with the exception provided at subsection (d), the discretionary function exception does not apply where an independent legal duty exists. The Supreme Court of Kansas has explained:

Simply stated, our more recent cases hold that the discretionary function exception is not applicable in those situations where a legal duty exists, either by case law or by statute, which the governmental agency is required to follow. The governmental agency cannot properly claim that its challenged action falls within the discretionary function exception where the action taken violated a legal duty.[76]

In this case, as discussed above, all of the defendants, including Green, owed an independent legal duty to Sisk. Further, as discussed in the court's analysis of plaintiffs' § 1983 claim against Green, the court believes that plaintiffs have raised a genuine issue of material fact regarding whether Green breached that duty of care.

---

**73.** Restatement (Second) of Torts § 314A(4) (1965).

**74.** *Id.* cmt. c.

**75.** *Griffin v. United States,* Case No. 00–4017KHV, 2000 WL 33200259, at *5 (D.Kan. Oct.16, 2000) (holding the United States Marshal Service had a legal duty of care with respect to a suicidal prisoner who escaped from custody and then committed suicide by jumping from the fourth floor atrium of a United States courthouse).

**76.** *Nero,* 253 Kan. at 587, 861 P.2d at 782 (quotation omitted) (holding the discretionary function exception did not apply where the defendant owed the plaintiff an independent legal duty); *see also Kastendieck v. Board of County Comm'rs,* 934 F.Supp. 387, 391 (D.Kan.1996) (citing *Dougan v. Rossville Drainage Dist.,* 243 Kan. 315, 322, 757 P.2d 272 (1988), for the proposition that the discretionary function exception does not apply where a legal duty exists which the governmental entity is required to follow).

In sum, Green is not entitled to immunity from liability under the KTCA. Accordingly, defendants' motion for summary judgment on plaintiffs' negligence claims against Green is denied.

### 3. Defendants Cole and King.

■■■ Lastly, the court will turn to plaintiffs' negligence claims against Cole and King. The court need not consider whether Cole and/or King are entitled to immunity under one of the KTCA exceptions because plaintiffs have failed to allege that either even arguably breached any duty of care to Sisk. As discussed above, plaintiffs have failed to direct the court's attention to any facts from which a reasonable jury could infer that Cole or King had any personal involvement in the events leading up to Sisk's suicide. Thus, the only arguable basis for plaintiffs' claims against Cole and King is negligent supervision.

As a preliminary matter, it is unclear whether Kansas would recognize a claim for negligent supervision.[77] What is clear, however, is that if Kansas courts were to recognize such a cause of action, it would require proof of elements that are not present in this case. In *Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc.*,[78] the Kansas Supreme Court made the following comments regarding a negligent retention and supervision jury instruction:

> When a third party asserts a negligent retention and supervision claim against an employer, liability results not because

of the employer-employee relationship, but because the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee that the employer had reason to believe would be likely to cause harm.[79]

In this case, there is no evidence from which a reasonable jury could infer that Cole or King knew that Manzanares tended to place suicidal inmates in hard lockdown rooms rather than rubber rooms and to give them regular woolen blankets. Nor is there any evidence from which a reasonable jury could infer that Cole or King knew that Johnson and Redd tended to disregard their obligations to conduct required periodic checks on suicidal inmates. Further, Cole and King certainly should not be held accountable for Green's actions, as they were not Green's supervisors; to the contrary, Green was their superior. In sum, there is no evidence to suggest that Cole or King knew that Manzanares, Redd, or Johnson had propensities to act carelessly in carrying out their obligations to provide medical care to suicidal inmates.

Accordingly, defendants' motion for summary judgment is granted insofar as it seeks dismissal of plaintiffs' state law neg-

---

**77.** *Compare Polson v. Davis*, 895 F.2d 705, 710 (10th Cir.1990) (concluding that the Kansas Supreme Court would decline to recognize a cause of action for negligent supervision), *with Kansas State Bank & Trust Co. v. Specialized Transportation Servcs., Inc.*, 249 Kan. 348, 362, 819 P.2d 587, 598 (1991) (suggesting in dicta that an employer can be liable for negligent supervision only under certain circumstances that were not present

in that case). *See also Beam v. Concord Hospitality, Inc.*, 873 F.Supp. 491, 504–05 (1994) (recognizing the apparent conflict between *Polson* and *Kansas State Bank & Trust,* but declining to resolve it).

**78.** 249 Kan. 348, 819 P.2d 587 (1991).

**79.** *Id.* at 362, 819 P.2d at 598.

ligence claim against defendants Cole and King.

### V.   Conclusion.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

A.   Defendants' motion for summary judgment (**doc. 115**) is granted in part and denied in part.   Specifically, it is granted with respect to plaintiffs' § 1983 claims against Green, Cole, King, and the DOC, and with respect to plaintiffs' state law negligence claims against Cole and King. Accordingly, Cole and King are dismissed from this case.   However, it is denied with respect to plaintiffs' § 1983 claims against Manzanares, Johnson, and Redd, and with respect to plaintiffs' state law negligence claims against Manzanares, Johnson, Redd, Green, and the DOC.

B.   A telephone status conference will be held on **October 28, 2002, at 4:00 p.m.** The court will initiate the call.   Counsel should be prepared to discuss whether convening a settlement conference would be productive, setting a firm trial date, and any other matters pertinent to moving this case to final judgment.

C.   The clerk shall mail copies of this memorandum and order to all counsel of record.