The **ESTATE OF Scotty Ray SISK, et al., Plaintiffs,**

v.

Joel **MANZANARES, et al., Defendants.**

No. 00–4088–JPO.

United States District Court, D. Kansas.

June 23, 2003.

Lee R. Barnett, Keith E. Renner, Barnett & Renner, PA, Auburn, KS, Kenneth D. Winford, Tenth Judicial District Public Defender, Olathe, KS, for Plaintiffs.

Craig C. Blumreich, William A. Larson, Gehrt & Roberts, Chartered, Timothy A. Shultz, Parker & Hay, LLP, Topeka, KS, for Defendants.

## MEMORANDUM AND ORDER

O'HARA, United States Magistrate Judge.

### I. Introduction.

This action arises from the suicide of Scotty Ray Sisk ("Sisk") while he was incarcerated at the Shawnee County Department of Corrections ("the DOC") in Topeka, Kansas. The plaintiffs, Sisk's estate and his survivors, asserted claims pursuant to 42 U.S.C. § 1983, alleging that various employees of the DOC violated Sisk's Eighth Amendment rights by being deliberately indifferent to his medical needs. Plaintiffs also asserted negligence claims under Kansas law.

The jury trial of this case began on April 14, 2003. On April 22, 2003, the jury returned a verdict in favor of defendants Joel Manzanares, Ryan Redd, and Andrew Johnson on plaintiffs' § 1983 claims, and against Manzanares, Redd, Johnson, and defendant Russell Green on plaintiffs' negligence claims.[1] The jury awarded Sisk's survivors, who are his parents, Dan and Sharon Sisk ("the Sisks"), $2,000 for funeral expenses and $10 million for noneconomic damages.[2]

---

1. The court previously granted summary judgment in favor of the DOC and Green, as well as defendants Brian Cole and Shawn King, on plaintiffs' § 1983 claims. *Sisk v. Manzanares*, 262 F.Supp.2d 1162, at 1186–87 (D.Kan.2002). The court also granted summary judgment in favor of Cole and King on plaintiffs' state law negligence claims. *Id.*

2. Without objection by any party, the court instructed the jury that it could allow the Sisks the amount of money that would reasonably compensate them for their injuries and damages resulting from their son's death, including economic loss for funeral expenses, and any noneconomic loss, with the latter type of damages defined as follows:

> This type of damage includes: (a) mental anguish, suffering, or bereavement, and (b) loss of society, comfort or companionship which you find has been and will be sustained by the Sisks because of the wrongful death of their son. For these items of damage, there is no unit value and no mathematical formula the court can give you. You should allow an amount which you find to be fair and just under all the facts and circumstances.

(Doc. 168, at Instruction No. 21.)

The parties, principally the plaintiffs, have filed numerous post-trial motions (docs. 172, 174, 178, 180, 181, 182, 183, and 189). The court, having carefully reviewed those motions, the memoranda in support, the response and reply briefs, and the partial transcripts of the case, now is prepared to rule. As explained below, the court will grant defendants' motion to alter or amend the judgment by reducing the amount of the judgment from $10,002,000 to $252,000, based on the applicable Kansas statutory wrongful death "caps" on damage awards. All other post-trial motions will be denied.

## II. Factual Background.

Sisk was incarcerated at the DOC on July 2, 1999, to serve a one-year sentence for violating a restraining order. A few days later, on July 6, 1999, his mother, Sharon Sisk, became concerned that her son was suicidal, believing that he had written a suicide note. Mrs. Sisk immediately called defendant Manzanares, a sergeant with the DOC who was the second-shift supervisor that day and who was also the DOC's suicide prevention training coordinator. Mrs. Sisk advised Manzanares of her concerns. Manzanares assured Mrs. Sisk that the DOC had a "state-of-the-art" facility and that nothing would happen to her son.

Manzanares promptly directed one of the DOC corrections officers under his authority to look for a suicide note in Sisk's cell. Such a note was found. Manzanares then interviewed Sisk and determined that he was, in fact, suicidal.[3] Manzanares ordered corrections officers to move Sisk from his general population jail cell to a "hard lockdown" cell in the DOC's medical module and to give him a mattress and a blanket. Manzanares, as part of placing Sisk on suicide watch, put Sisk's name on a list for a psychiatric evaluation at the next available opportunity. Pursuant to the DOC's standard operating procedures then in effect,[4] Sisk was also dressed in paper clothing specially designed to tear so that it could not be used as an aid to commit suicide.

The DOC's written suicide prevention procedures called for suicidal inmates to be placed in "protrusion-free" rooms. There are two types of rooms in the DOC's medical module that are arguably protrusion free. One type is known as a "rubber room," which has walls, ceilings, and floors that have been treated with rubber coating. The rubber rooms do not contain any fixtures on the walls, such as bathroom equipment or hooks, or any other protrusions that an inmate could use as an anchor a hanging device. The other type of "protrusion free" cell at the DOC is called a "hard lockdown" room. It is similar in its dimensions to a rubber room except that it is constructed of concrete or cinder block walls. Both types of cells have a concrete floor and a square hole in the floor for inmate urination and defecation. On July 6, 1999, the DOC's written procedures did not distinguish between rubber rooms and hard lockdown rooms.

Manzanares testified that he considered both rubber rooms and hard lockdown rooms to be protrusion-free. However, some corrections officers testified they were trained and/or that it was the prac-

---

**3.** Although Sisk verbally assured Manzanares that he was not suicidal, and did so convincingly, out of an abundance of caution Manzanares decided to place Sisk on "suicide watch."

**4.** The court and plaintiffs were advised informally by defendants during trial that, after Sisk's suicide, the DOC dramatically changed and improved its management in general and its suicide prevention procedures in particular. However, for legal and/or tactical reasons, no party attempted to present evidence to the jury of these subsequent remedial measures.

tice within the DOC to place suicidal inmates in rubber rooms, and in hard lockdown rooms only if rubber rooms were unavailable. Manzanares did not attempt to determine whether a rubber room was available for Sisk on July 6, 1999. It was undisputed, however, that none of the rubber rooms actually were in use that evening.

The hard lockdown cell in which Manzanares ordered Sisk to be placed had a metal plate attached to the wall just to the left of the door.[5] The plate was shaped like an electrical light-switch-plate cover with a slit in the center, but no switch protruded from the slit. The plate served to cover the cell's thermostat. By comparison, no such switch-plate covers were attached to the walls in the rubber rooms.

The DOC's written procedures also called for a suicidal inmate to be given, whenever possible, a blanket. Regardless of the written policy, however, some corrections officers at the DOC testified that they were trained and/or that it was the practice within the DOC to give suicidal inmates a blanket only if the blanket was a specially manufactured suicide preventative blanket. Such blankets had been available in the corrections industry in general and at the DOC at various times prior to July 6, 1999. But, the DOC did not maintain a consistent supply of these special blankets. One time, the DOC had purchased paper shrouds for suicidal inmates to use as a blanket substitute.[6]

By July 6, 1999, the DOC had been out of the suicide preventative blankets for quite some time. In fact, it had become an issue at the DOC. Corrections officer Mary Ellen Brown testified at trial via deposition that most of the corrections officers wanted clarification regarding the correct procedure with regard to blankets for suicidal inmates. She stated that the corrections officers knew that suicidal inmates needed suicide blankets, but the DOC had been out of the blankets and supervisors had been told that they needed to be ordered. Some supervisors would instruct the corrections officers to just leave suicidal inmates in their cells without a blanket, while others would tell the officers to go ahead and give the suicidal inmates the DOC's standard-issue woolen blankets. These regular prison blankets are very thick and thus difficult to tear, but it is uncontroverted that Sisk succeeded in tearing his blanket. In any event, Manzanares was aware of the fact that the DOC did not have any suicide preventative blankets in stock the evening of July 6, 1999.

The evening of July 6, 1999, soon after Manzanares interviewed Sisk, officer Brown delivered Sisk's personal belongings to the medical module. At that time, she did a quick "health and well-being check" on Sisk. Brown had two significant concerns: (1) Sisk was in a hard lockdown room instead of a rubber room; and (2) Sisk had been given a standard-issue woolen blanket rather than a suicide preventative blanket. Brown pointedly expressed her concerns to Manzanares, who told her "to just leave everything alone. He'd [Sisk] be all right."[7]

---

5. The DOC permanently removed this plate from the cell after Sisk's suicide.

6. Defendant Green, who was a captain at the DOC in 1999, was responsible for procuring suicide prevention items. He had no direct dealings with Sisk. In any event, his employment ended as part of the subsequent remedial measures discussed above.

7. Of course, Manzanares turned out to be quite wrong, in that obviously Sisk would not be "all right." However, there is no credible evidence in the record that Manzanares maliciously or cavalierly disregarded Brown's stated concerns. He simply disagreed with Brown.

At approximately 10:00 p.m., Manzanares went home as scheduled at the end of the second shift. At that time, defendants Redd and Johnson came on duty as corrections officers responsible for patrolling the medical module during the third shift.

The DOC's written procedures mandated periodic checks on suicidal inmates:

> The inmate will be checked on video monitor at least every fifteen (15) minutes. An "Inmate Health and Well Being" checklist will be initialed and signed by the shift supervisor. At least once every thirty (30) minutes a notation will be made as to what the subject is doing. This entry should be dated, timed and initialed by the reporting officer.

As part of the third shift briefing on the evening of July 6, 1999, both Redd and Johnson were advised that Sisk was a suicidal inmate in the medical module. Both testified that they conducted the fifteen-minute health and well being checks by visually checking Sisk approximately every fifteen minutes.

Redd made all of the notations on Sisk's health and well-being checklist. This log states that checks were conducted at 10:30 p.m., 10:45 p.m., 11:00 p.m., 11:15 p.m., and 11:30 p.m. Redd's badge number (# 932), but not Johnson's badge number (# 984), is listed next to the 10:30 p.m., 10:45 p.m., and 11:00 p.m. entries. Both badge numbers are listed next to the 11:15 p.m. and the 11:30 p.m. entries. Redd testified that it was possible he may have made the 11:30 p.m. entry and/or corrected a mistake on the 11:15 p.m. entry approximately one hour after he actually made those checks. However, one witness testified that, when she looked at the log sheet laid out at the officers' work station during the evening in question, she observed no entries on Sisk's health and well-being checklist after "Jake" (the second-shift correc-

tions officer) made his last entry at 10:13 p.m.

There was testimony at trial that corrections officers occasionally missed the fifteen-minute health and well being checks of suicidal inmates. When that occurred, it was common practice to leave a blank space so the officer who missed the check could go back and write it in on the checklist. That is, the health and well-being log sheets were occasionally filled in after the fact.

As noted above, the DOC's written procedures required suicidal inmates to be checked by video monitor. The hard lockdown cell and the rubber rooms are equipped with video cameras that transmit a signal to a monitoring station in the medical module. The DOC staffed the monitoring station only during the first and second shifts (even though it is well known in the corrections industry that most suicide attempts occur on the third shift). Thus, the monitoring station was not staffed after 10:20 p.m. on July 6, 1999. Redd and Johnson admit that, as part of their patrolling the medical module on July 6, 1999, neither of them ever utilized the video monitors to observe Sisk. Instead, Johnson testified that he would "visually check the person at the door every 15 minutes." He conceded, though, that he could not see the entire cell when he visually checked at the door of the cell, whereas the video monitors would have provided an unobstructed view of virtually the entire cell.

Catherine Smith, a jail nurse at the DOC, testified at trial that she was scheduled to work until 10:00 p.m. on July 6, 1999. After her shift technically ended, however, she claims that she continued working in the medical module to finish up paperwork and that she did not actually leave the module until between 11:25 p.m. and 11:35 p.m. that evening. She testified

that she did not hear the heavy, noisy doors to the medical module open or close between the time Jake left at approximately 10:10 p.m. and the time she left at approximately 11:30 p.m. She did not observe *any* officer (i.e., Redd, Johnson, or anyone else) performing any health and well being checks during that time period.[8]

Smith further testified that, when she left the DOC at approximately 11:30 p.m., two or three officers were standing around looking in the window of Sisk's cell door. She asked them what they were looking at, and they said that they could not see him [Sisk] in there.

It is uncontroverted that Redd and Johnson found Sisk hanging in his cell at approximately 11:30 p.m. Sisk was sitting to the left of the cell door with his back leaning against the wall. Redd and Johnson opened the cell door and found Sisk with a noose around his neck. The parties agree that Sisk tore his woolen blanket into strips, pried the metal plate from the wall, wrapped the blanket around the metal plate and around his neck, sat down with his back against the wall, leaned forward, and choked himself to death.

Upon entering the hard lockdown cell, Redd immediately placed his hands under Sisk's armpits in order to relieve the pressure of the noose. Meanwhile, Johnson retrieved a noose cutter from a medical trauma bag and cut the noose. At 11:32 p.m., Johnson radioed his supervisor and advised him of the situation. The supervisor, who was in the book-in area when he received Johnson's call, went directly to the medical module unit and radioed to the control center to request that the "911"

emergency unit be called. DOC personnel conducted cardiopulmonary resuscitation ("CPR") until the emergency medical treatment ("EMT") unit arrived at 11:38 p.m., when EMT personnel continued CPR. At 11:39 p.m., the first response fire department team arrived at the scene and tried to revive Sisk. He was pronounced dead at the hospital early in the morning of July 7, 1999.

The jury ultimately returned a verdict in favor of defendants Manzanares, Redd, and Johnson on plaintiffs' § 1983 claims. Given the stipulated jury instructions and form of verdict concerning the applicable legal standard, this verdict constituted an explicit finding that none of these defendants violated Sisk's constitutional rights by being deliberately indifferent to his medical needs. However, the jury specifically found, in the context of the Sisks' state law claims, that defendants Manzanares, Redd, Johnson, and Green all were negligent. As previously mentioned, the jury awarded the Sisks $10 million in non-economic damages and $2,000 in funeral expenses, and the parties now have filed various post-trial motions.

### III. Analysis and Discussion.

A. *Plaintiffs' Motion for Judgment Notwithstanding the Verdict or, Alternatively, for a New Trial on Plaintiffs' Claims for Deliberate Indifference and Punitive Damages.*

The court will first consider plaintiffs' motion for judgment notwithstanding the verdict (*i.e.*, for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b)) or, alternatively, for a new trial and for punitive damages **(docs. 178 & 182).[9]** Defen-

---

**8.** Smith's testimony was hotly contested at trial. Defendants impeached her repeatedly and effectively. The court believes that the most reasonable inference that can be drawn is that the jury did not find Smith to be very credible. That is, if the jury had found her credible, the jury presumably would have

found for plaintiffs and against Redd and Johnson on the deliberate indifference claims under the Eighth Amendment pursuant to § 1983.

**9.** Doc. 178 is virtually identical, in relevant part, to doc. 182.

dants have responded (docs. 180, 185 & 186),[10] and the time for plaintiffs to reply has expired.[11] As discussed previously, the jury determined that defendants Manzanares, Redd, and Johnson were negligent, but not deliberately indifferent. By way of the instant motion, plaintiffs seek judgment as a matter of law or, alternatively, a new trial and punitive damages on plaintiffs' claim pursuant to § 1983 that these defendants violated Sisk's constitutional rights by being deliberately indifferent to his medical needs. For the reasons explained below, the court will deny this motion in all respects.

### 1. *Legal Standards.*

Judgment as a matter of law "should be cautiously and sparingly granted," [12] and is appropriate "only if the evidence, viewed in the light most favorable to the nonmoving party, points but one way and is susceptible to no reasonable inferences supporting the nonmoving party." [13] The court may not reweigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.[14] Nevertheless, the court must find more than a mere scintilla of evidence favoring the nonmovant.[15] The court must find that "evidence was before the jury upon which it could properly find against the movant." [16] The court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could properly return a verdict for the nonmoving party.[17] Conversely, the court must enter judgment as a matter of law in favor of the moving party if " 'there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law.' " [18]

Motions for new trials, like motions for judgment as a matter of law, also are generally regarded with disfavor and should only be granted with great caution.[19] Where a motion for a new trial is based on the verdict being against the weight of the evidence, as is the case here, the motion generally presents a question of fact, not law, and is committed to the trial court's discretion.[20] In significant contrast to the standards governing motions for judgment as a matter of law, the court here may weigh the evidence for itself and assess the credibility of the witnesses in deciding whether to grant a new trial.[21] "A new trial is not warranted sim-

---

10. Doc. 186 is a duplicate of doc. 185.

11. *See* D. Kan. Rule 6.1(e).

12. *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir.2001) (quotation omitted); *accord Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir.1996).

13. *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 962–63 (10th Cir.2002) (quotation omitted); *see also Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1162 (10th Cir.2000).

14. *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1279 (10th Cir.2003); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir.2001).

15. *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir.1995).

16. *Clark v. Brien*, 59 F.3d 1082, 1086 (10th Cir.1995).

17. *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir.1996).

18. *Id.* at 1546–47 (quoting Fed.R.Civ.P. 50(a)).

19. *Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir.1992).

20. *Patton v. TIC United Corp.*, 77 F.3d 1235, 1242 (10th Cir.1996); *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 616 (10th Cir.1984).

21. *Rivera v. Rivera*, 262 F.Supp.2d 1217, at 1228 (D.Kan.2003) (collecting case law and considering this particular issue in great detail).

ply because the court would have reached a different verdict."[22] Rather, the court should invoke its discretionary power only in the exceptional case where the verdict is clearly, decidedly, or overwhelmingly against the weight of the evidence.[23]

### 2. *Discussion and Analysis.*

Plaintiffs' briefs correctly recite these procedural standards. But then plaintiffs proceed to completely ignore (or at least fail to apply) those standards to the trial record. That is, plaintiffs' recitation of facts reads like a closing argument and blithely glosses over various pieces of evidence that were favorable to the defense and that the jury was free to deem credible and persuasive. In this sense, plaintiffs' post-trial motions border on being frivolous.

■ For the reasons explained below, the court believes that the jury's verdict in this case was amply supported by the evidence, and indeed fairly predictable. By no means was the jury's verdict against the weight of the evidence. Although plaintiffs had considerable grounds on which to impeach defendants Manzanares, Redd, and Johnson, and thus the jury properly could have chosen to disbelieve some or even all of their testimony, the court believed that all three testified forcefully and credibly,[24] such that the jury was equally free, given the state of the record

as a whole, to believe most or all of what they testified to about their handling of Sisk's suicidal condition. Therefore, plaintiffs clearly are not entitled to judgment as a matter of law, a new trial, or punitive damages on their § 1983 claims.

### a. *Defendant Manzanares.*

At trial, it was uncontroverted that Manzanares had virtually guaranteed Mrs. Sisk that her son would be safe in the DOC's state-of-the-art facility. Yet, Manzanares then proceeded to have Sisk placed in a hard lockdown cell with a metal switch plate rather than one of the undeniably protrusion-free rubber rooms that were available that evening. Manzanares also had Sisk given a standard-issue woolen blanket rather than a suicide preventative blanket or no blanket at all. Both of these choices were arguably contrary to the DOC's policies, procedures, and practices. Moreover, Manzanares was the DOC's suicide prevention training coordinator and thus presumably should have known better. In fact, as earlier indicated, officer Brown testified that she directly questioned Manzanares, who notably was her direct supervisor, about the propriety of Sisk's placement in the hard lockdown cell and the fact that he was given a woolen blanket.

On the other hand, there can be no question that Manzanares acted promptly

---

**22.** *Hillman v. United States Postal Serv.,* 169 F.Supp.2d 1218, 1222 (D.Kan.2001) (quotation omitted); *accord Boyce v. Board of Comm'rs,* 857 F.Supp. 794, 797 (D.Kan.1994).

**23.** *Veile v. Martinson,* 258 F.3d 1180, 1188 (10th Cir.2001); *Patton,* 77 F.3d at 1242; *McGraw Edison,* 736 F.2d at 616.

**24.** This positive assessment of credibility cannot legitimately be shared by defendant Green, the DOC captain who was in charge of procuring suicide preventative blankets. As mentioned earlier, the court entered summary judgment against plaintiffs on their § 1983

claim against Green. As a result, the only claim against Green at trial was negligence. Based on his own testimony and that of various others, there can be no doubt that he was the least credible and least likable of any witness who testified during this lengthy trial. He was shown to be an arrogant, uncouth, and insensitive individual who had little, if any, regard for the truth. Nevertheless, with that being said, the evidence at trial did not demonstrate that Green possessed the subjective awareness that would have been necessary to support plaintiffs' § 1983 claim against him.

after he received the telephone call from Mrs. Sisk. He identified Sisk as a suicide risk, had him moved to a safer cell, and placed on suicide watch. Sisk was also given tearable paper clothing. Significantly, there was no suggestion at trial that other suicidal inmates had previously attempted to hang themselves via the switch-plate cover in the hard lockdown cell since the facility opened many years earlier. In fact, Manzanares testified that he believed there was no substantial risk that Sisk would be able to commit suicide.

Based on this evidence, the jury's verdict that Manzanares was negligent, but not deliberately indifferent, was well supported by the evidence at trial. The jury's verdict is logical and clearly not against the weight of the evidence. Indeed, in contrast to the strength of plaintiffs' evidence against defendants Redd and Johnson, the court informed plaintiffs during trial that the § 1983 claim against defendant Manzanares was awfully "thin," such that any verdict against him on that claim might be set aside via a post-trial motion.

b. *Defendants Redd and Johnson.*

As was the case with the evidence against defendant Manzanares, credible evidence was presented at trial both for and against defendants Redd and Johnson. On the one hand, nurse Smith testified that she did not hear the heavy, noisy doors to the DOC's medical module open or close between the time that Jake (the second-shift corrections officer) left at approximately 10:10 p.m. (he actually logged his last check of Sisk at 10:13 p.m.) and the time that nurse Smith left at approximately 11:30 p.m. Further, one witness testified that she looked at the health and well-being checklist laid out at the officers' work station and observed no entries on it

after the 10:13 p.m.-entry by Jake. Additional evidence was presented from which the jury could have inferred (had they chosen to) that Redd and Johnson spent no time in the medical module and that they falsified some or all of the entries on the checklist. In addition, putting aside what they may have been orally told to do, Redd and Johnson admittedly violated the DOC's written procedures by failing to monitor Sisk by way of a video monitor, rather than by looking through the window of the cell which did not afford as thorough of a view of the cell.

On the other hand, though, both Redd and Johnson testified unequivocally that they conducted all of the required fifteen-minute visual checks on Sisk. Also, Redd and Johnson testified that they believed that Manzanares, who was both their superior and the DOC's suicide prevention training coordinator, had taken reasonable precautions to ensure that Sisk did not have the means necessary to commit suicide. Again, even though Sisk's cell had a switchplate, there was no evidence that past experiences should have led Redd or Johnson to believe that this plate posed a substantial risk that Sisk would use it as an aid to commit suicide.

Based on this conflicting evidence, the jury permissibly could have concluded that Redd and Johnson conducted all, some, or none of the required 15–minute checks on Sisk. Therefore, as with the jury's verdict regarding defendant Manzanares, the jury's verdict that Redd and Johnson were negligent, but not deliberately indifferent, was well supported by the evidence at trial and was not against the weight of the evidence.[25]

---

**25.** It follows, of course, that if the jury had believed nurse Smith and disbelieved Redd and Johnson, a verdict in favor of plaintiffs on their § 1983 claim would not have been subject to attack under Rule 50 by these two defendants.

### c.  *Punitive Damages.*

Logically, it follows that substantial evidence supported the jury's verdict that punitive damages should not be assessed against any of the defendants.  As plaintiffs acknowledge, the only basis for punitive damages in this case was their § 1983–deliberate indifference claim.  Because neither the jury nor the court found that defendants acted with deliberate indifference, obviously there is no basis for an award of punitive damages.

In sum, plaintiffs are not entitled to judgment as a matter of law, a new trial, or punitive damages because the jury's verdict was supported by the evidence and was not against the weight of the evidence.  Accordingly, plaintiffs' motion for such rulings is denied.

### B.  *Plaintiffs' Motion for Attorneys' Fees.*

Next, the court will consider plaintiffs' motion for attorneys' fees (**docs. 178 & 183**).[26]  Defendants have responded (docs. 185, 186 & 188), and the time for plaintiffs to reply has expired.[27]  By way of this motion, plaintiffs request their attorneys' fees pursuant to 42 U.S.C. § 1988.

Under § 1988, the court may allow a prevailing party to recover attorneys' fees in any action or proceeding to enforce 42 U.S.C. §§ 1981, 1981a, 1982, 1983, 1985, 1986, Title IX, the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, Title VI, or the Violence Against Women Act.[28]  The court has authority to award attorneys' fees under § 1988 only to parties who prevail in those actions specifically listed.[29]

In this case, the only one of these provisions that plaintiffs brought suit under was § 1983.  Plaintiffs did not prevail on their § 1983 claims.  Indeed, plaintiffs acknowledge that the court should award attorneys' fees only if the court were to grant their motion for judgment as a matter of law or, alternatively, for a new trial on plaintiffs' § 1983 claims.  The court declined to grant such ruling in section II(A) above.  Accordingly, plaintiffs clearly are not entitled to relief under § 1988 and their motion for attorneys' fees is denied.

### C.  *Applicable Damage Caps.*

Next, the court will address the crux of the parties' dispute, which concerns the damage caps that apply in this case.  Specifically, defendants have filed a motion to alter or amend (*i.e.*, reduce) the judgment (**doc. 172**).  The court has reviewed defendants' motion and memorandum in support (doc. 173) and plaintiffs' response (doc. 179).  The time for defendants to reply has expired.[30]

Further addressing the same issue presented in defendants' motion, plaintiffs have filed a motion for enforcement of the entire $10,002,000 judgment on plaintiffs' negligence claims (**docs. 178 & 180**).[31]  Defendants have responded (docs. 185, 186 & 188), and the time for plaintiffs to reply has expired.[32]

For the reasons explained below, defendants' motion is granted and plaintiffs' mo-

---

**26.**  Doc. 178 is virtually identical, in relevant part, to doc. 183.

**27.**  *See* D. Kan. Rule 6.1(e).

**28.**  42 U.S.C. § 1988(b).

**29.**  *N.C. Dep't of Transp. v. Crest St. Cmty. Council, Inc.*, 479 U.S. 6, 12, 107 S.Ct. 336, 93 L.Ed.2d 188 (1986) ("On its face, § 1988 does not authorize a court to award attorney's fees except in an action to enforce the listed civil rights laws.").

**30.**  *See* D. Kan. Rule 6.1(e).

**31.**  Doc. 178 is virtually identical, in relevant part, to doc. 180.

**32.**  *See* D. Kan. Rule 6.1(e).

tion is denied. Specifically, the court will reduce the judgment to $252,000.

### 1. *Statutory Caps.*

█ The parties do not dispute the propriety of the $2,000 award in favor of the Sisks for funeral expenses in connection with their negligence claim against Manzanares, Redd, Johnson, and Green. Defendants, however, contend that the $10 million award for noneconomic damages on the negligence claim should be reduced to $250,000 consistent with the caps imposed by the Kansas wrongful death statute.[33] Plaintiffs respond by arguing that the court should enforce the entire $10 million verdict or, alternatively, apply the $500,000 damage cap under the Kansas Tort Claims Act ("KTCA").[34]

The parties have not cited, and the court has not located, any Kansas case law that directly addresses the interplay of the $250,000 cap under the wrongful death statute and the $500,000 limitation of liability under the KTCA. Thus, the issue presented is solely one of statutory interpretation.

Under the KTCA, governmental entities are "liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment **under circumstances where the governmental entity, if a private person, would be liable** under the laws of this state."[35] Thus, liability under the KTCA only exists to the same extent that a private person would be held liable.[36] A private person could only be held liable for up to $250,000 in nonpecuniary damages in a wrongful death action brought under Kansas law.[37] Therefore, as a matter of fairly straightforward statutory construction, it follows that liability for the nonpecuniary (*i.e.*, noneconomic, in this case) damages component of the verdict cannot exceed $250,000.

Plaintiffs, without citing any statute, precedent, or other persuasive authority, argue that a particular provision of the KTCA, K.S.A. 75-6105(a), trumps the $250,000 damage cap for nonpecuniary damages. However, K.S.A. 75-6105(a) simply provides that liability for claims under the KTCA "**shall not exceed $500,000 for any number of claims arising out of a single occurrence or accident.**"[38] The plain language of this statute does not contradict the general rule that governmental entities are only liable for damages under the KTCA to the same extent as a private person. The statute does not purport to enlarge the general rule of liability. It simply provides a limitation on liability.

In sum, under the Kansas wrongful death statute, the $10 million award for noneconomic damages must, as a matter of law, be reduced to $250,000.[39] The KTCA

---

**33.** *See* K.S.A. 60–1903(a). Specifically, K.S.A. 60–1903(b) directs the court to enter judgment of $250,000 for nonpecuniary loss if the jury verdict for nonpecuniary loss exceeds $250,000.

**34.** *See* K.S.A. 75–6105(a).

**35.** K.S.A. 75–6103(a) (emphasis added).

**36.** *Kastendieck v. Board of County Comm'rs,* 934 F.Supp. 387, 391 (D.Kan.1996) ("[A] governmental entity generally is liable to the same extent as a private person."); *Lanning ex rel. Lanning v. Anderson,* 22 Kan.App.2d 474, 478, 921 P.2d 813, 817 (1996) ("[G]ov-ernmental entities and governmental employees acting within the scope of their employment are liable for damages to the same extent as a private person.").

**37.** K.S.A. 60–1903(a).

**38.** K.S.A. 75–6105(a) (emphasis added).

**39.** The Sisks should not infer from this legally required ruling that the court ascribes a low value to their son's life, or a low value on the grief they have suffered as a result of their son's death. With that being said, the Sisks should be aware of the fact that, even if there were no statutory caps on damages applicable

does not enlarge this liability.[40]

### 2. *Constitutionality.*

■ Next, the court will address plaintiffs' arguments that applying *any* damage cap in this case, whether by virtue of the Kansas wrongful death statute or the KTCA, is unconstitutional because it violates due process, equal protection, and the right to a jury trial. The court flatly rejects plaintiffs' arguments for three reasons. First, plaintiffs waived these arguments by failing to include them in the final pretrial order.[41] Second, plaintiffs failed to follow the required procedure for raising claims of unconstitutionality.[42] Third, as a matter of law, plaintiffs' arguments are plainly without merit.[43]

The Seventh Amendment of the United States Constitution provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and **no fact tried by a jury shall be otherwise reexamined** in any Court of the United States, than according to the rules of the common law." [44] Federal courts uniformly

---

to this case, given the state of the record as a whole, it is highly improbable that the $10 million verdict for purely noneconomic loss could have withstood post-trial and/or appellate scrutiny. Simply stated, the $10 million verdict legally would still have to be drastically reduced by way of remittitur.

**40.** Given the court's ruling that the KTCA does not operate to enlarge liability beyond the wrongful death statute damage cap, plaintiffs' separate argument regarding K.S.A. 75–6111 is moot. Suffice it to say, however, that the court believes this argument is frivolous.

The court has received a series of letters, initiated by plaintiffs' counsel, in which they requested that the court "hold off" on ruling on the instant motion while they obtained materials relating to Shawnee County's so-called "decision to become self-insured," which plaintiffs argue under K.S.A. 75–611 would serve to vitiate even the $500,000 damages cap contained in the KTCA. Such informal letters are inappropriate procedures for requests for relief. Requests for relief must be presented to the court by way of a motion.

In any event, however, the court will not postpone its ruling simply to await receipt of these materials because, as stated previously, the court believes that plaintiffs' argument regarding Shawnee County's so-called self-insured status is frivolous from a legal standpoint. Thus, additional factual evidence relating to this issue would be irrelevant.

**41.** *See Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir.2002) (claims, issues, defenses, or theories of damages not included in the pretrial order are waived).

**42.** Title 28 U.S.C. § 2403(b) and D. Kan. Rule 24.1 require the Attorney General of the State of Kansas to be notified of plaintiffs' claim that K.S.A. 60–1903(a) is unconstitutional. The purpose of this requirement is to allow the state to present evidence and arguments in support of the constitutionality of the statute. Where, as here, the court is upholding the constitutionality of the statute, intervention probably would be futile. Nevertheless, in order to ensure that the Attorney General at least has an opportunity to intervene, if so desired, the clerk is directed to serve a certified copy of this memorandum and order on the Attorney General of the State of Kansas. The Attorney General shall file any motion to intervene and reconsider this decision within ninety days after service.

**43.** To the extent that it might be inferred that plaintiffs are arguing that this damage cap violates the Kansas constitution, the Supreme Court of Kansas has already rejected the argument that the $250,000 cap on nonpecuniary damages under the wrongful death statute violates the Kansas constitution by impairing the right to trial by jury, violating due process, and/or violating equal protection. *See Adams v. Via Christi Reg'l Med. Ctr.,* 270 Kan. 824, 833, 19 P.3d 132, 139 (2001); *Leiker v. Gafford,* 245 Kan. 325, 359–65, 778 P.2d 823, 846–50 (1989), *overruled in part on other grounds, Martindale v. Tenny,* 250 Kan. 621, 629, 829 P.2d 561, 566 (1992). Thus, the court's application of the damage cap in the instant case does not violate the Kansas constitution.

**44.** U.S. Const. amend. VII (emphasis added).

have held that statutory damage caps do not violate the Seventh Amendment,[45] largely because a court does not "reexamine" a jury's verdict or impose its own factual determination regarding what a proper award might be. Rather, the court simply implements a legislative policy decision to reduce the amount recoverable to that which the legislature deems reasonable.

In this instance, the Kansas legislature has made a policy decision to limit the amount of nonpecuniary damages recoverable in a wrongful death action to $250,000. Regardless of whether the court believes that this policy decision was wise or well-reasoned, the court need not "reexamine" the jury's verdict in order to implement the legislative policy. The court need only apply the statute. Thus, application of the $250,000 cap does not violate the right to a trial by jury under the Seventh Amendment to the United States Constitution.

With regard to plaintiffs' due process and equal protection arguments under the federal constitution, the court initially notes that "a limitation on a common law measure of recovery does not violate a fundamental right or create a suspect classification."[46] Therefore, the court reviews plaintiffs' due process and equal protection arguments under the rational basis test.[47] "Under this standard, a statute is presumed to be constitutional and must be upheld if it 'rationally further[s] a legitimate state interest.'"[48] The $250,000 cap is designed to prevent juries from awarding excessive damages out of sympathy for a decedent's family.[49] When the Kansas legislature enacted this statute, it was engaging in its fundamental and legitimate role of structuring and accommodating the burdens and benefits of economic life.[50] While certainly it can be argued that this absolute and inflexible cap (and others like it) are far too restrictive or even entirely unnecessary given the long-standing availability of remittitur to deal with excessive jury verdicts,[51] there can be little question that such damage caps at least rationally further legitimate state interests and, therefore, do not violate the Due Process or Equal Protection

**45.** See, e.g., Hemmings v. Tidyman's, Inc., 285 F.3d 1174, 1202 (9th Cir.2002) (holding Title VII's $300,000 damage cap does not violate the Seventh Amendment right to a jury trial); Madison v. IBP, Inc., 257 F.3d 780, 804 (8th Cir.2001) (same), judgment vacated on other grounds, 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002); Davis v. Omitowoju, 883 F.2d 1155, 1159–65 (3d Cir.1989) (holding a $250,000 statutory cap on noneconomic damages in medical malpractice actions does not violate the Seventh Amendment right to a jury trial); Boyd v. Bulala, 877 F.2d 1191, 1196 (4th Cir.1989) (holding a $750,000 statutory cap in medical malpractice actions does not violate the Seventh Amendment right to a jury trial); Franklin v. Mazda Motor Corp., 704 F.Supp. 1325, 1330–35 (D.Md.1989) (holding a $350,000 statutory cap on noneconomic damages does not violate the Seventh Amendment right to a jury trial).

**46.** Boyd, 877 F.2d at 1196; accord Davis, 883 F.2d at 1158.

**47.** Patton v. TIC United Corp., 77 F.3d 1235, 1247 (10th Cir.1996) (holding the Kansas statute that caps noneconomic damages in personal injury cases at $250,000, K.S.A. 60–19a02(b), "involves no suspect classification").

**48.** Id. (quoting Nordlinger v. Hahn, 505 U.S. 1, 8–10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)).

**49.** Leiker v. Gafford, 245 Kan. 325, 363, 778 P.2d 823, 849 (1989), overruled in part on other grounds, Martindale v. Tenny, 250 Kan. 621, 629, 829 P.2d 561, 566 (1992).

**50.** Patton, 77 F.3d at 1247.

**51.** See generally 11 Charles Alan Wright et al., Federal Practice & Procedure § 2815 (2d ed.1995).

Clauses of the United States Constitution.[52]

Plaintiffs argue that enforcement of the applicable statutory caps on damages would render "meaningless" the conscientious work of the jurors who served in this case. The court respectfully disagrees. Plaintiffs overlook that, at the start and end of trial, the jury was instructed that their duty was to find the facts, and the court had a duty to apply the law even if the jurors might not understand or agree with the law. In this case, both the jury and court have done their respective duties.

Accordingly, defendants' motion to alter or amend the judgment is granted[53] and plaintiffs' motion for enforcement of the entire judgment on plaintiffs' negligence claims is denied. The court will reduce the $10 million award for noneconomic damages to $250,000.

### D. *Plaintiffs' Motion for Entry of Judgment in Favor of the Estate.*

Plaintiffs' also have moved to "correct the verdict form and entry of judgment in favor of the Estate of Scotty Ray Sisk" **(docs. 178 & 181).**[54] Defendants have responded (docs. 185, 186 & 188), and the time for plaintiffs to reply has expired.[55] Consistent with the jury verdict in this case, the court entered judgment in favor of the Sisks on the state law negligence claim, and against the estate of Scotty Sisk on the § 1983 claim. By way of the instant motion, plaintiffs ask the court to also enter judgment in favor of the estate. For the reasons explained below, plaintiffs' motion is denied.

The court will construe plaintiffs' request for the court to enter judgment in favor of the estate as a motion to alter or amend the judgment pursuant to Fed. R.Civ.P. 59(e). Rule 59(e) preserves the district court's right to alter or amend a judgment after the judgment is entered. Motions to alter or amend a judgment are appropriate where they involve "reconsideration of matters properly encompassed in the decision on the merits."[56] A Rule 59(e)-motion allows a party to allege fundamental legal errors that require the court to reconsider an earlier decision.[57] A party cannot invoke Rule 59(e) to raise

---

52. *See, e.g., id.* (holding that K.S.A. 60-19a02(b), which is the $250,000 statutory damage cap on noneconomic damages in personal injury actions, does not violate federal equal protection); *Davis,* 883 F.2d at 1159 (holding a $250,000 statutory cap on noneconomic damages in medical malpractice actions does not violate federal due process or equal protection); *Boyd,* 877 F.2d at 1196–97 (holding a $750,000 statutory cap in medical malpractice actions does not violate federal due process or equal protection); *Lucas v. United States,* 807 F.2d 414, 421–22 (5th Cir. 1986) (holding a statutory damage cap does not violate federal due process or equal protection); *Hoffman v. United States,* 767 F.2d 1431, 1435–37 (9th Cir.1985) (holding a $250,000 statutory damage cap on noneconomic losses in medical malpractice actions does not violate federal due process or equal protection).

53. Defendants filed an alternative motion to alter or amend the judgment **(doc. 174)** for the court's consideration only "in the event the Court for some reason does not apply the damage limi[ta]tion of $250,000 on nonpecuniary damages in K.S.A. 60–1903." That is, in such event, defendants asked that the court grant a remittitur so as to reduce the nonpecuniary damage award to $250,000. Because the court is applying this damage cap, defendants' alternative motion is denied as moot.

54. Doc. 178 is virtually identical, in relevant part, to doc. 181.

55. *See* D. Kan. Rule 6.1(e).

56. *White v. N.H. Dep't of Employment Sec.,* 455 U.S. 445, 451, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982).

57. *Federated Mut. Ins. Co. v. Botkin Grain Co.,* 856 F.Supp. 607, 609 (D.Kan.1994).

arguments or evidence that could have been raised prior to judgment,[58] or to re-hash arguments previously considered and rejected by the court.[59]  That is, Rule 59(e) is "aimed at *re* consideration, not initial consideration," and thus a party may not rely on Rule 59(e) to raise an argument that could and should have been made before judgment issued.[60]

In this case, plaintiffs could have raised the instant argument before this case was submitted to the jury.  Based on the proposed jury instructions and verdict forms filed by the parties (docs. 152, 153, 162, and 165), the court drafted its own proposed jury instructions and verdict form for all concerned to discuss at the jury instruction conference (doc. 166).  The damages component of the court's proposed verdict form, as originally drafted, read as follows:

3.  What amount of damages do you find were sustained by the Estate of Scotty Sisk?

$ _____

4.  What damages do you find were sustained by Dan and Sharon Sisk?

Noneconomic                          loss
$ _____
Funeral                           expenses
$ _____

The phrasing of Question 3 on the verdict form was specifically addressed during the jury instruction conference.  Eventually, in response to defense counsel's objection, plaintiffs' counsel suggested: "If No. 3 is the problem, why don't we just add on to the end of it: 'What amount of damages do you find were sustained by the estate of Scotty Sisk **under his Eighth Amendment claim'?**" [61]  Defense counsel responded: "That's fine.  I have no problem with that." [62]  Thus, the court informed the parties:

What I'm going to do is on Question No. 3 of the proposed verdict form, it will be rewritten to state "What amount of damages do you find were sustained by the estate of Scotty Sisk **on the Eighth Amendment claim**" as suggested by [plaintiffs' counsel].  And lest there be any internal inconsistencies on the verdict form, on the same line I'm going to modify question No. 4 to read, "What damages do you find were sustained by Dan and Sharon Sisk **on the negligence claim.**" [63]

The court then inquired: "Any other objections by any of the parties to any of the instructions or to the verdict form?" [64]  Plaintiffs' counsel responded, "Plaintiff has none, Your Honor." [65]  The court then proceeded to revise the verdict form consistent with the discussion and agreement of the parties' attorneys during the instruction conference, and so instructed the jury (*see* doc. 168).

As just explained, during the instruction conference, the parties and the court specifically discussed the very component of the verdict form to which plaintiffs now object.  Plaintiffs voiced no objection to this part of the verdict, let alone state the legal basis for any such objection.  Obvi-

---

58.  *Steele v. Young,* 11 F.3d 1518, 1520 n. 1 (10th Cir.1993);  11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (2d ed.1995).

59.  *Brumark Corp. v. Samson Res. Corp.,* 57 F.3d 941, 948 (10th Cir.1995).

60.  *United States ex rel. Noyes v. Kimberly Constr., Inc.,* 43 Fed. Appx. 283, 286–87 (10th Cir.2002).

61.  (Doc. 184 at 32 (emphasis added)).

62.  *Id.*

63.  *Id.* at 34 (emphasis added).

64.  *Id.* at 35.

65.  *Id.*

ously and clearly, plaintiffs could have raised this issue before the jury began its deliberations, as the court gave plaintiffs an ample opportunity to do so. In short, plaintiffs have failed to preserve the objection now raised.[66]

Rule 51 of the Federal Rules of Civil Procedure specifically states that, "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."[67] The obvious rationale for Rule 51 is to give the trial judge an opportunity to correct any mistake *before* the jury begins its deliberations.[68] In this case, as explained above, plaintiffs did not timely assert the instant objection to the verdict form. Therefore, the court reviews the matter only for plain error.[69]

■ To constitute plain error, the court must have made a mistake that was both obvious and substantial.[70] With all due respect to plaintiffs, the court is unpersuaded that it made a mistake at all, let alone a mistake that was obvious and substantial, by submitting the verdict form in the manner that the court did. Based on numerous comments made by plaintiffs' counsel throughout this case, it has been the court's understanding that it was largely irrelevant, as a practical matter, whether judgment on the negligence claim[71] was ultimately entered in favor of Dan and Sharon Sisk and/or the estate because, in either event, the Sisks would receive any amounts recovered given that they are the only persons entitled to any distribution from their son's estate. Thus, the court is hard pressed to understand why plaintiffs would even bother raising this issue at this procedural juncture.

■ The only explanation the court can conceivably muster is plaintiffs may believe that, if judgment were also entered in favor of the estate, the estate arguably would be entitled to an additional $250,000 in noneconomic damages. That is, in this regard, plaintiffs have argued that, without any factual or legal support, "at least $250,000 should be awarded to the Estate of Scotty Ray Sisk from [sic] wrongful death." However, it is well-settled under Kansas law that a wrongful death claim can only be brought on behalf and for the benefit of the decedent's heirs, not his estate.[72] Thus, as a matter of law, Sisk's estate is not entitled to recover anything for his wrongful death. Therefore, the court is unpersuaded that it erred by submitting the verdict form in the manner that it did.

In sum, plaintiffs failed to preserve this belatedly raised argument that they should have raised before this case was submitted to the jury. The court did not commit error at all, much less plain error, by

---

**66.** *See, e.g., Johnson v. Unified Gov't,* 180 F.Supp.2d 1192, 1202 (D.Kan.2001) (holding plaintiffs failed to preserve objections where "plaintiffs raised certain concerns about the court's verdict form, [but] none of those concerns had anything to do with the specific issues about which they now complain").

**67.** Fed.R.Civ.P. 51.

**68.** *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 553 (10th Cir.1999); *Weir v. Fed. Ins. Co.,* 811 F.2d 1387, 1390 (10th Cir.1987).

**69.** *See Giron v. Corr. Corp. of Am.,* 191 F.3d 1281, 1289 (10th Cir.1999) (court will reverse only for plain error where a party has not complied with Rule 51).

**70.** *Camfield v. Okla. City,* 248 F.3d 1214, 1233 (10th Cir.2001).

**71.** Admittedly, the distinction was significant on plaintiffs' § 1983 claims because these could only be brought by the estate.

**72.** K.S.A. 60–1902; *Tank v. Chronister,* 160 F.3d 597, 599 (10th Cir.1998).

submitting the verdict form in the manner in which it did. Accordingly, plaintiffs' motion for entry of judgment in favor of the estate is denied.

### E. *Plaintiffs' Objection to Judgment in a Civil Case Form and/or Request for Clarification of Judgment.*

Lastly, the court will consider plaintiffs' pleading styled "Objection to Judgment in a Civil Case Form and/or Request for Clarification of Judgment" **(doc. 189).** Plaintiffs here ask that the court enter judgment against the DOC based on the negligence verdict against defendants Manzanares, Redd, Johnson, and Green. The time for defendants to respond to this pleading has expired,[73] and therefore the court considers it unopposed. Nevertheless, for the reasons explained below, the court will deny plaintiffs the relief sought by way of the instant pleading.

The Federal Rules of Civil Procedure do not recognize an "objection to judgment" or a "request for clarification of judgment." Therefore, as a threshold matter, the court must determine how this pleading should be construed. The most apparent alternatives are a Rule 59(e)-motion to alter or amend the judgment or a Rule 60(b)-motion for relief from judgment. Whether a motion is considered under Rule 59(e) or under Rule 60(b) depends on when it was filed.[74] A Rule 59(e)-motion must be filed within ten days of judgment;

motions filed after that time must be considered under Rule 60(b).[75] In this case, the judgment was filed on April 23, 2003, and plaintiffs did not file the instant motion until May 20, 2003, well past the 10–day time limit for filing a Rule 59(e)-motion. The court is without authority to extend the 10–day time period specified in Rule 59(e).[76] Therefore, the instant pleading must be construed as a Rule 60(b)-motion for relief from judgment.

Relief under Rule 60(b) is extraordinary and may only be granted in exceptional circumstances.[77] A party seeking relief under Rule 60(b) must satisfy one or more of the six grounds set forth in the rule.[78] Notably, plaintiffs do not specify which of these six grounds they are attempting to invoke. The court, however, can envision that at least two of them arguably apply: Rule 60(b)(1) and Rule 60(b)(6).

### 1. *Relief Under Rule 60(b)(1).*

■ Rule 60(b)(1) allows a party to obtain relief from judgment based on "mistake, inadvertence, surprise, or excusable neglect." The movant has the burden of pleading and proving the mistake or excusable neglect.[79] Relief is generally only warranted where: (1) a party made an excusable litigation mistake or an attorney acted without authority from a party; or (2) the judge made a substantive mistake of law or fact in the final judgment or order.[80]

---

**73.** *See* D. Kan. Rule 6.1(e).

**74.** *Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991).

**75.** *Id.*

**76.** Fed.R.Civ.P. 6(b) (providing that the court "may not extend the time for taking any action under Rule[ ] ... 59(b), (d) and (e)"); *Weitz v. Lovelace Health Sys., Inc.,* 214 F.3d 1175, 1179 (10th Cir.2000); *Collard v. United States,* 10 F.3d 718, 719 (10th Cir.1993) ("Rule 6(b) expressly prohibits a trial court

from extending the time to file [a Rule 59(e) ] motion.").

**77.** *Yapp v. Excel Corp.,* 186 F.3d 1222, 1231 (10th Cir.1999); *Cashner v. Freedom Stores, Inc.,* 98 F.3d 572, 576 (10th Cir.1996).

**78.** *Van Skiver,* 952 F.2d at 1243–44.

**79.** *Pelican Prod. Corp. v. Marino,* 893 F.2d 1143, 1146 (10th Cir.1990).

**80.** *Yapp,* 186 F.3d at 1231; *Cashner,* 98 F.3d at 576.

█ A litigation mistake is not considered to be an excusable one within the meaning of Rule 60(b)(1) if it was the result of a deliberate and counseled decision by the complaining party.[81] Rather, an excusable litigation mistake refers to a mistake that the party "could not have protected against, such as counsel acting without authority."[82] Simply misunderstanding or failing to predict the legal consequences of deliberate choices "cannot later, once the lesson is learned, turn back the clock to undo those mistakes."[83]

█ In this case, plaintiffs did not bring this lawsuit against a governmental entity with the capacity to be sued. That is, the DOC does not have the capacity to be sued.[84] Notably, the court specifically pointed out this procedural defect in footnote 1 on the very first page of the court's October 3, 2002 memorandum and order ruling on defendants' motion for summary judgment (doc. 133).[85] This issue was the subject of discussion, repeatedly, during subsequent status conferences with the court. Defense counsel affirmatively represented to the court and to plaintiffs' counsel on more than one occasion that the DOC fully intended to pay any judgment entered against the DOC's employees. However, to the best of the court's recollection, defense counsel repeatedly and very carefully stopped short of stipulating that judgment should be entered against the DOC if the jury returned a verdict against any of the individual defendants. Yet, plaintiffs never took any action to join the proper governmental entity with the capacity to be sued, i.e., the Board of Commissioners of Shawnee County, Kansas.

Thus, by the time of the trial of this case, plaintiffs and their attorneys had been on actual notice for more than six months that the DOC did not have the capacity to be sued, and still they did not obtain any stipulation from the DOC (at least, any stipulation of which the court is aware) that the court should enter judgment against the DOC if the jury returned a verdict against any of the individual defendants. Nor did plaintiffs join the Board of Commissioners of Shawnee County as a defendant. The instant predicament is simply a product of carelessness. There is no basis here for relief under Rule 60(b)(1).

█ The court will now turn to the second ground for relief under Rule 60(b)(1), i.e., that the judgment was the result of a judicial mistake. In this respect, relief under Rule 60(b)(1) is available only for "obvious errors of law" that are "apparent on the record."[86] The rule does not provide a basis for relief if the court's conclusions are "arguable."[87]

In this case, the court properly entered judgment according to the jury's verdict. To the extent the instant motion might be construed as arguing that the verdict form was erroneous, the court is wholly unpersuaded that it committed any legal error

**81.** *Yapp,* 186 F.3d at 1231 (citing *Cashner,* 98 F.3d at 576).

**82.** *Id.*

**83.** *Id.; see also Pelican Prod. Corp.,* 893 F.2d at 1146 ("Carelessness by a litigant or his counsel does not afford a basis for relief under Rule 60(b)(1).").

**84.** *Barngrover v. County of Shawnee,* Case No. 02–4021–JAR, 2002 WL 1758914, at *2 (D.Kan. June 10, 2002) (holding that the Shawnee County DOC does not have the capacity to be sued).

**85.** *Sisk v. Manzanares,* 262 F.Supp.2d 1162 n. 1 (D.Kan.2002).

**86.** *Van Skiver v. United States,* 952 F.2d 1241, 1244 (10th Cir.1991).

**87.** *Id.*

by failing to include the DOC on the verdict form. A specific subject of discussion during the jury instruction conference was whether the verdict form should reflect plaintiffs' negligence claim against the DOC. Plaintiffs' counsel initially stated that the jury should be given the opportunity to evaluate whether the DOC itself was negligent.[88] Then, after some discussion, plaintiffs' counsel conceded that the DOC could only be held liable on a theory of respondeat superior because the DOC can only act through its agents. In fact, as the court stated during the jury instruction conference, the only negligence claim that plaintiffs preserved against the DOC in the pretrial order was a respondeat superior claim. Ultimately, plaintiffs' counsel withdrew their objection to the proposed verdict form and, therefore, did not ask the court to submit the issue of the DOC's liability to the jury.[89]

Indeed, as a matter of law, no finding by the jury was required in order for the DOC to be held liable for the judgment. The KTCA provides that governmental entities are liable "for damages caused by the negligent or wrongful act or omission of any of its employees acting within the scope of their employment[.]"[90] The parties have stipulated that, at all times relevant to this case, defendants Manzanares, Redd, Johnson, and Green all were acting within the scope of their employment.

Further, the KTCA defines a "governmental entity" as a "state or municipality."[91] The DOC is not a "state," and thus it must be a "municipality" in order to be vicariously liable. The KTCA broadly defines a "municipality" as a "county, township, city, school district or other political or taxing subdivision of the state, **or any agency, authority, institution or other instrumentality thereof.**"[92] Given this broad definition, the court is persuaded that the DOC is vicariously liable as a matter of law for the judgment entered against the individual defendants.

Under different circumstances, the court would have no difficulty entering judgment against the DOC because it is, in fact, vicariously liable.[93] However, the court is unpersuaded that it would be an obvious error of law in this case to decline to enter judgment against the DOC at this belated date because, as explained previously, the DOC does not have the capacity to be sued.[94] Thus, the court will next evaluate whether Rule 60(b)(6) affords plaintiffs with a basis for relief.

2. *Relief Under Rule 60(b)(6).*

■■■ Rule 60(b)(6) allows the court to relieve a party from a final judgment for "any ... reason justifying relief from the operation of the judgment." Relief under Rule 60(b)(6) is even more difficult to attain than relief under Rule 60(b)(1).[95] Although Rule 60(b)(6) is regarded as "a 'grand reservoir of equitable power to do justice in a particular case,'"[96] this power

88. (Doc. 184 at 16–17.)

89. *Id.* at 22.

90. K.S.A. 75–6103(a).

91. K.S.A. 75–6102(c).

92. K.S.A. 75–6102(b) (emphasis added).

93. *See, e.g., Dickerson v. City Bank & Trust Co.,* 590 F.Supp. 714, 716 (D.Kan.1984) (noting that the court granted a motion to alter or amend to reflect the vicarious liability of an employer).

94. *See, e.g., Fugate v. Unified Gov't,* 161 F.Supp.2d 1261, 1267 (D.Kan.2001) (explaining that although the KTCA definition of governmental entity and municipality includes county and city agencies, it does not "imbue all local government agencies with the capacity to sue or be sued").

95. *Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1225 (10th Cir.2002).

96. *In re Woods,* 173 F.3d 770, 780 (10th Cir. 1999) (quoting *Pierce v. Cook & Co.,* 518 F.2d 720, 722 (10th Cir.1975) (en banc)).

must be reserved for situations in which it offends justice to deny relief.[97] The court's power under Rule 60(b)(6) is not to be used to "reliev[e] a party from free, calculated and deliberate choices he has made. A party remains under a duty to take legal steps to protect his own interests." [98]

As described previously, despite prodding by the court, early and often, plaintiffs either deliberately or carelessly did not join the Board of Commissioners of Shawnee County as a defendant. Therefore, relief under Rule 60(b)(6) is unavailable to plaintiffs. This is not a case of extraordinary circumstances where it would offend justice to deny plaintiffs the relief requested because plaintiffs have numerous alternatives to attempt to collect the judgment.

■■■ There is, of course, the judgment against the four individual defendants. As described previously, the DOC is vicariously liable for this judgment under the KTCA. Consistent with this vicarious liability, defense counsel has repeatedly represented to plaintiffs and the court that the DOC (acting by and through the county) intends to pay any final negligence judgment entered against the individual defendants. Given the state of the record, the court has no reason to believe that the DOC will not stand by defense counsel's representations. Thus, plaintiffs are not entitled to relief under Rule 60(b)(6).

Accordingly, plaintiffs' objection to judgment and/or request for clarification of judgment is denied.

### V. Conclusion and Order.

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1. Defendants' motion to alter or amend judgment **(doc. 172)** is granted. Specifically, the clerk is directed to reduce the amount of judgment in this case from $10,002,000 to $252,000.

2. Defendants' alternative motion to alter or amend judgment by way of remittitur **(doc. 174)** is denied as moot.

3. Plaintiffs' motion for judgment notwithstanding the verdict or, alternatively, for a new trial and for punitive damages **(docs. 178 & 182),** is denied.

4. Plaintiffs' motion for attorneys' fees **(docs. 178 & 183)** is denied.

5. Plaintiffs' motion to enforce entire judgment **(docs. 178 & 180)** is denied.

6. Plaintiffs' motion for entry of judgment in favor of the estate of Scotty Ray Sisk **(docs. 178 & 181)** is denied.

7. Plaintiffs' objection to judgment and/or request for clarification of judgment **(doc. 189)** is denied.

8. The clerk shall serve copies of this memorandum and order on all counsel of record. Further, the clerk is directed to serve a certified copy of this memorandum and order on the Attorney General of the State of Kansas, consistent with section III(C)(1) of the court's memorandum decision.

**97.** *Middle Rio Grande,* 294 F.3d at 1225; *Yapp v. Excel Corp.,* 186 F.3d 1222, 1232 (10th Cir.1999).

**98.** *Cashner v. Freedom Stores, Inc.,* 98 F.3d 572, 580 (10th Cir.1996) (quotation omitted).